**Calvin DANFORTH et al.**

v.

**STATE DEPARTMENT OF HEALTH AND WELFARE et al.**

Supreme Judicial Court of Maine.

April 17, 1973.

Patricia A. Danisinka, Pine Tree Legal Assistance, Inc., Skowhegan, Robert E. Mittel, Pine Tree Legal Assistance, Inc., Portland, for plaintiffs.

Janice M. Lynch, Robert B. Calkins, Asst. Attys. Gen., Agusta, John W. Philbrick, Portland, for amicus curiae.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

POMEROY, Justice.

This appeal from a judgment entered by a Justice of this Court acting in the Superior Court in a habeas corpus proceeding raises an important question of first impression in this State.

The appellants are the natural parents of a minor child.

Proceeding agreeably to the provisions of 22 M.R.S.A. § 3792, the Department of Health and Welfare caused a petition seeking an order of the appropriate court that the custody of the minor child be taken from the parents and be given to the Department of Health and Welfare of the State of Maine.

This petition was initiated in the District Court, District #7, Kennebec County, which Court it is conceded had jurisdiction of the subject matter and the parties.

An Order issued removing the child from the custody of appellants and placing custody in the Department.

This habeas corpus petition followed.

There is no issue raised but that the District Court gave appropriate notice of the pendency of the petition to the appellants.

It is agreed that a hearing was had in the District Court and that both parents were in attendance and participated in such hearing.

It is established by stipulation that at all times material hereto the petitioners were indigent.

Also agreed is that the appellants were at no time advised by the District Court of any right to court-appointed counsel and were not aware that any such right might exist.

The issue with which we are faced is: In a proceeding initiated under 22 M.R.S.A. § 3792, do indigent parents, against whom the petition is directed, have a right to counsel appointed by the Court and provided at the State's expense?

The presiding Justice citing Robinson v. Kaufman, 8 Cal.App.3d 783, 87 Cal.Rptr. 678 (1970), cert. denied sub nom., Kaufman v. Carter, 402 U.S. 964, 91 S.Ct. 1624, 29 L.Ed.2d 128 (1971), as a leading authority, felt constrained in his role as a single Justice to give "No" as his answer in recognition of the generally accepted distinction between "criminal" and "civil" proceedings.

We, not being so constrained, reach an opposite conclusion.

We hold that an indigent parent or parents against whom a custody petition is instituted under 22 M.R.S.A. § 3792 is entitled to have counsel appointed at the State's expense unless the right to counsel is knowingly waived.

We say this is so because the Constitution of the United States and the Constitution of Maine compel such conclusion.

The statute under which the Department of Health and Welfare purported to act in the instant case (22 M.R.S.A. § 3792) gives jurisdiction to the Probate Court of the County or appropriate District Court to take custody of a child from natural parents and "order such child committed into the custody of the department or into the custody of any suitable person, provided that such person consents to accept custody of such child." This may be done whenever "after hearing, it appears" that any allegation of the complaint that a child,

> ". . . named in the petition is living in circumstances which are seriously jeopardizing the health, welfare or morals of such child and is in need of protective custody . . . ."

is true.

Both the Court in *Kaufman* and the single Justice below premised the conclusion reached on the action being civil in its nature.

Few courts considering neglect statutes have addressed themselves to the basic question of whether there is a substantive constitutional right in parents to raise their children. The Constitution itself provides no readily apparent answer. Nowhere is the raising of children mentioned in the Federal Constitution and the power to define and regulate domestic relations has

been generally thought to have been left to the states.

While the precise question here before us has never been squarely decided by the Supreme Court of the United States, there has been ample suggestion by that Court that the right to raise one's children is of constitutional dimension.

Over half a century ago Mr. Justice McReynolds, speaking for the court in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1922), said:

> "The problem for our determination is whether the statute as construed and applied unreasonably infringes the liberty guaranteed to the plaintiff in error by the Fourteenth Amendment. 'No State shall . . . deprive any person of life, liberty, or property without due process of law.'

> "While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, *to marry, establish a home and bring up children,* to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." (Emphasis supplied) 262 U.S. at 399, 43 S.Ct. at 626.

Later in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed 1070 (1924), the Court restated its view that

there is a constitutionally protected right of parents to bring up their children when it said:

> "The fundamental theory of liberty upon which all governments in the Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only." 268 U.S. at 535, 45 S.Ct. at 573.

While this theory of substantive due process appeared to have been abandoned in Ferguson v. Skrupa, 372 U.S. 726, 83 S. Ct. 1028, 10 L.Ed.2d 93 (1963), (a case involving a statute regulating the business of debt adjusting); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) and most recently Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), made it abundantly clear the theory of the existence of substantive due process is still viable. In *Griswold* both Mr. Justice Douglas, who delivered the opinion of the Court, and Mr. Justice Goldberg, in a concurring opinion[1] in which he was joined by the Chief Justice and Mr. Justice Brennan, referred to the penumbra of specific guarantees of the Bill of Rights.

■ Whatever may be the portion of the Bill of Rights giving rise to the constitutional protection of the right to raise one's children, we are satisfied such protection exists under the Federal Constitution.

In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), Mr. Justice White summarized earlier decisions of that Court emphasizing the importance of the family as follows:

> "The Court has frequently emphasized the importance of the family. The

---

[1]. "This Court, in a series of decisions, has held that the Fourteenth Amendment absorbs and applies to the States those specifics of the first eight amendments which express fundamental personal rights. The language and history of the Ninth Amendment reveal that the Framers of the Constitution believed that there are

additional fundamental rights, protected from governmental infringement, which exist alongside those fundamental rights specifically mentioned in the first eight constitutional amendments." 381 U.S. at 488, 85 S.Ct. at 1683 (Goldberg, J., concurring) (footnote omitted).

rights to conceive and to raise one's children have been deemed 'essential,' Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, [1045, 29 A.L.R. 1446] (1923), 'basic civil rights of man,' Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, [1660], (1942), and '[r]ights far more precious . . . than property rights,' May v. Anderson, 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221, [1226] (1953). 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can [n]either supply nor hinder.' Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, [652], (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, 262 U.S. at 399, 43 S.Ct. [625], at 626, [67 L.Ed. at 1045], the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra, 316 U.S. at 541, 62 S.Ct. [1110], at 1113, [86 L.Ed. at 1660], and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496, 85 S.Ct. 1678, 14 L. Ed.2d 510, [522], (1965) (Goldberg, J., concurring)."

The importance of the natural right of a parent to have custody of his children has often been noted by this Court. Merchant v. Bussell, 139 Me. 118, 27 A.2d 816 (1942); Stanley v. Penley, 142 Me. 78, 46 A.2d 710 (1946).

Having decided, as we have, that the natural right of a parent to have custody of his children has constitutional dimensions, we turn to the question whether the constitutional requirement of procedural due process can be satisfied without the appointment of counsel at the State's expense for an indigent parent whose right to raise his children is sought to be abridged by the State.

█ There is no single set of procedural safeguards that may be applied, as a standard of due process, in all judicial proceedings. Due process is a flexible concept, to be applied in any action in a manner which is meaningful and appropriate in terms of the nature of that proceeding, with the ultimate objective of guaranteeing fairness in all judicial actions.

In Cafeteria Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) the Court stated:

".  .  . the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation . . ."

And further

".  .  . what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action."

367 U.S. at 895, 81 S.Ct. at 1748.

See also Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

Neither is the determination of what constitutes due process in any particular proceeding conducive to a static standard. Mr. Justice Frankfurter, concurring in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L. Ed. 817 (1951), stated that

".  .  . 'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Expressing as it does in its ultimate analysis respect enforced by law for that feeling of just treatment which has been evolved through · centuries of Anglo-American constitutional history and civilization, 'due process' cannot be imprisoned within the treacherous limits of any formula. Representing a profound attitude of fair-

ness between man and man, *and more particularly between the individual and government,* 'due process' is compounded of history, reason, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess. Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process." 341 U.S. at 162–163, 71 S.Ct. at 644. (Emphasis added)

We have before us a confrontation between the State and two individuals, a circumstance of great importance in determining a standard of fairness.

Decisional law demonstrates the flexibility of the due process concept in actions between the State and the individual. At one end of the spectrum of governmental-individual relations, it has been held that due process of law does not require a hearing "in every conceivable case of governmental impairment of private interests." Cafeteria Workers v. McElroy, supra. But as the subject of governmental interference shifts from mere property rights, liberties derived from shifting economic arrangements, the need for procedural safeguards becomes more compelling. Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949).

Thus, in Goldberg v. Kelly, supra, the Supreme Court held that due process required that a welfare recipient be afforded a hearing prior to the termination of his benefits. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), presented to the Supreme Court an action substantially similar to that now before us. The Court ruled that removing children from the custody of their natural parent raised such a significant issue that the

state was constitutionally bound to provide the parent with notice and a hearing.[2]

■ At the other end of the spectrum of governmental-individual relations is, of course, the area of criminal prosecutions. In this area the governmental action is limited by the strictest standard of due process. Before the State may interfere with a person's liberty, that person must be afforded, *inter alia*, rights of notice, hearing, confrontation, assistance of counsel, proof beyond a reasonable doubt, and trial by jury as minimum essentials of due process of law.

■ Near this more stringent end of the due process spectrum fall the juvenile delinquency actions. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), provided, as minimum essentials of due process, that the juvenile be afforded rights of notice, assistance of counsel, confrontation, cross-examination and the right against self-incrimination. In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), provided the juvenile the guarantee that his delinquency must be proven beyond a reasonable doubt. However, due process in the juvenile context is not coterminous with due process in the criminal context. McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), held that the right to trial by jury was not an essential element of due process in juvenile proceedings. This Court has held in S**** S**** v. State, Me., 299 A.2d 560 (1973), that due process does not require that a finding of delinquency necessarily requires that the juvenile be found to have committed acts which, if committed by an adult, would be criminal.

We begin our consideration of the issue presented by the Danforths' petition against this background of authority.

■ As an action more nearly approximates a criminal prosecution, the demand

---

2. We held that the law of Maine requires a hearing in such situations in In re Ed-

ward's Estate, 161 Me. 141, 210 A.2d 17 (1965).

for procedural safeguards increases. In any given action, the necessity of a particular safeguard is to be evaluated in light of the nature of the proceeding and by the nature of the interest upon which the government seeks to infringe.

It is patent that need for a particular safeguard is not to be determined by the label affixed to the action in question. We said in Harrington v. Harrington, Me., 269 A.2d 310 (1970), that the application of constitutional rights (in that case the guarantee of equal protection) is not based upon a distinction between civil and criminal cases. The civil-criminal distinction is also relatively unimportant in determining what are the demands of due process in any given action. Mr. Justice Blackmun summarized this position in *McKeiver* when he stated that:

"Little, indeed, is to be gained by any attempt simplistically to call the juvenile court proceeding 'civil' or 'criminal.' The Court carefully has avoided this wooden approach." 403 U.S. at 541, 91 S.Ct. at 1984.

We, therefore, view as of little weight the fact that Maine has determined neglect proceedings pursuant to 22 M.R.S.A. § 3792 et seq. to be civil in nature.

In a neglect proceeding the full panoply of the traditional weapons of the state are marshalled against the defendant parents. The Department is designated to represent the State at the hearing but may, at its option, request that the County Attorney represent the State as he would in criminal prosecutions. The Department has access to public records concerning the family, the services of professional social workers to investigate the family situation and to give testimony at the hearing and the Department's representative at the hearing has knowledge and experience in legal proceedings, subpoena powers, familiarity with the law of evidence, and the ability to examine witnesses.

The crucial issues in a neglect proceeding may be difficult to grasp and consequently difficult to refute for an uneducated and unsophisticated layman. The expert testimony presented by the Department may include that of psychologists whose jargon is usually beyond the understanding of the ordinary person. The statement in Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), that "even the intelligent and educated layman has small and sometimes no skill in the science of law" would apply to neglect proceedings in the same manner as it applies to criminal prosecutions. The average parent would be at a loss when faced with problems of procedure, evidence, or cross-examination. Statistical studies conducted in other jurisdictions indicated markedly different results between neglect proceedings where the parent has assistance of counsel and those proceedings where the parent is without counsel. See Note, Child Neglect: Due Process For The Parent, 70 Colum.L.Rev. 405, 476 (1970). We agree with the Oregon Supreme Court that for most parents involved in neglect actions "the entire proceedings [are] incomprehensible." State v. Jamison, 251 Or. 114, 444 P.2d 15 (1968).

The neglect proceeding is accusatory inasmuch as the Department is attempting to demonstrate that the parents' conduct has failed to measure up to a socially and legally acceptable norm. Indeed, testimony as to conduct resulting in a finding of neglect might also be the basis of criminal prosecution.[3]

In criminal prosecutions where imprisonment was to be imposed, the parent would be entitled to counsel under Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L. Ed.2d 530 (1972). We cannot dismiss the possibility that a parent appearing in a ne-

---

3. The Department, under 22 M.R.S.A. § 3791, is authorized to investigate and prosecute instances of "offenses against children." See 17 M.R.S.A. § 851 et seq. These statutes provide for imprisonment upon a finding of guilt.

glect hearing without the assistance of counsel might make self-incriminatory statements that could result in a criminal prosecution.

The fact that a parent is not fined or imprisoned as a result of a neglect proceeding does not make the prospect of the loss of custody of one's child anything less than punishment in the eyes of the parent. See Note, Child Neglect: Due Process For The Parent, 70 Colum.L.Rev. 465, 478 (1970). That the State's objective is not penal but directed at providing a suitable home for the child has little effect on the position of the parent. In some instances the loss of one's child may be viewed as a sanction more severe than imprisonment.[4]

In the instant case the beneficent intention of the Department as to the child has little effect on the awesome sanction of the loss of their daughter imposed upon the Danforths for their failure to meet the legal standards of parenthood.

In determining whether the right of natural parents to custody of their children is protected by the Constitution of Maine, we are not confronted with the problems which faced us in determining whether the right was one protected against State impingement (except for vindication of a compelling State interest) under the U. S. Constitution. In our discussions relating to the Constitution of the United States, we had to give consideration to the nature of federalism.

Article I, Sec. 6–A, Constitution of Maine, contains express provision against depriving any person of life, liberty or property without due process of law.

Mr. Justice Dunn, speaking for a majority of this Court in State v. Old Tavern Farm, Inc., 133 Me. 468, 471, 180 A. 473, 474–475 (1935), said:

"The Constitution of the State of Maine affirmatively secures to all persons an equality of right to pursue any lawful occupation under equal regulation and protection by law. Its words are these: 'All men are born equally free and independent, and have certain natural, inherent and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness.' "

It seems clear beyond the possibility of dispute that the Constitution of Maine recognizes this right of the parent to custody of his child and affords it its protection.

Since the State acting under the provisions of 22 M.R.S.A. § 3792 seeks to take away that natural right of the parents, Article I, Sec. 6, of the Constitution of Maine, demands that this not be done except as the State shall abide by the "law of the land", i. e., due process of law. Jordan v. Gaines, 136 Me. 291, 8 A.2d 585 (1939).

As we said with reference to the Federal Constitution, where the interest sought to be impinged by the State is the natural and fundamental right of the parents to the custody of their children, the minimal requirements of procedural due process include the right to have counsel appointed at State's expense when the parents are indigent and desire such counsel.

We are entirely in accord with the reasoning of Mr. Justice Black when he wrote (dissenting from a denial of certiorari in Kaufman v. Carter, 402 U.S. 954, 91 S.Ct. 1624, 29 L.Ed.2d 124) (1971):

"The necessity of state-appointed counsel is particularly acute in cases like one of those before us, Kaufman v. Carter, where the State initiates a civil proceeding against an individual to deprive her of the custody of her children. Here the State is employing the judicial mechanism it has created to enforce society's will upon an individual and take away her chil-

---

4. In Gault the court viewed the nonpunitive, protective intent of juvenile "homes" or schools as "of no constitu-
tional consequence—and of limited practical meaning" when viewed in light of the actual effect on the child.

dren. The case by its very nature resembles a criminal prosecution. The defendant is charged with conduct—failure to care properly for her children—which may be criminal and which in any event is viewed as reprehensible and morally wrong by a majority of society. And the cost of being unsuccessful is dearly high—loss of the companionship of one's children. Indeed, *Boddie* [Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113] held that an indigent was entitled to state-paid court costs in a divorce contest, and such cases almost always involve the custody of children. Certainly, if the State must provide funds for an indigent mother's court costs for a divorce, the State should also provide her with counsel to protect her rights to something far more important to most mothers and to society—her right to custody of her children." 402 U.S. at 959–960, 91 S.Ct. at 1627.

Because of the nature of the interest protected by the Constitution we must and do hold that procedural due process requires that counsel be appointed at State's expense in any proceeding under 22 M.R. S.A. § 3792 upon a proper showing that the party or parties against whom the proceeding is commenced is indigent unless the right to counsel is knowingly waived.

In the instant case since no counsel was appointed for these indigent appellants and the right to counsel was not waived,

The entry must be,

Appeal sustained.

WEBBER, J., did not sit.

DUFRESNE, Chief Justice (separately concurring).

I agree with Mr. Justice Pomeroy's opinion in reasoning and result. However, since the case of S**** S**** v. State, 1973, Me., 299 A.2d 560, has been cited for the proposition that "due process does not require that a finding of delinquency necessarily requires that the juvenile be found to have committed acts which, if committed by an adult would be criminal", I must renew the message conveyed by my dissent in that case. I do agree that certain juvenile conduct under 15 M.R.S.A., § 2552, such as "habitual truancy" and "repeatedly deserting one's home without just cause", conduct not criminal in terms of adult behavior, may be the basis of a juvenile offense without any infringement of constitutional due process. The reason for this is that habitual truancy is specifically defined in the statute (see, 15 M.R.S.A. § 2502(2) and the statutory provision—repeatedly deserting one's home without just cause—is a concept of sufficient clarity that it provides adequate information to juveniles as to the statutorily prohibited conduct and affords a reasonable degree of guidance to the enforcement authorities and the courts to permit equal dispensation of justice to the poor as well as to the rich, to the less fortunate as to the well oriented, to the troublesome as to the most docile juveniles. However, I still maintain that constitutional due process requires, to support a finding of delinquency for juvenile conduct which in adults would not be criminal, except as mentioned above, that the statute prohibiting the juvenile conduct must define the juvenile offense in terms of sufficient specificity as to furnish necessary intelligible standards to guide the child, his parents, the police and the courts. Statutory vagueness in legislation regulating juvenile conduct under penalty of State wardship, removal from parental control and loss of home, is equally abhorrent to the juvenile under considerations of fair play, if not more so, as the failure of the State to provide counsel for indigents in neglect proceedings may be to the parents of the juvenile.

I equate the natural right of a parent to have custody of his children as against the State to the natural right of a child not to be removed from his parents for juvenile misconduct, and consider both to be of

constitution dimension, neither of which should be abridged except within the strictures of procedural due process.

With this explanation, I concur in the Court's opinion.

WERNICK, Justice (separately concurring).

In the present case I join in both the opinion of Justice Pomeroy for the Court and Chief Justice Dufresne's separate concurrence.

Since I find no inconsistency in such attitude, notwithstanding that the Chief Justice's concurrence is predicated on his belief that he "must renew the message conveyed by . . . [his] dissent . . ." in S\*\*\*\* S\*\*\*\* v. State, Me., 299 A.2d 560 (1973), a case in which I was with the Court majority, I find it desirable to add a brief explanation of my view.

In my judgment the majority in S\*\*\*\* S\*\*\*\* v. State did not disagree with the Chief Justice's statement of principle that

"constitutional due process requires, to support a finding of delinquency for juvenile conduct which in adults would not be criminal, . . ., that the statute prohibiting the juvenile conduct must define the juvenile offense in terms of suf-

ficient specificity as to furnish necessary intelligible standards to guide the child, his parents, the police and the courts."

This proposition was acknowledged by the majority and formed the basic premise of its rationale. In S\*\*\*\* S\*\*\*\* v. State the disagreement between the majority and the Chief Justice in dissent was, therefore, not a difference as to the content of controlling principle but was rather only a difference in opinion as to the application of the principle to a particular factual situation.

I take the precaution of emphasizing this point to ensure that there shall be no misunderstanding of the fundamental import of the decision in S\*\*\*\* S\*\*\*\* v. State,— in particular to avoid any possibility that that case may be looked upon as a repudiation, rather than an acceptance, of the proposition that "constitutional due process" is operative in the governmental control of juvenile misconduct. The decision in S\*\*\*\* S\*\*\*\* v. State is that there are compellingly important differences between the misconduct of juveniles and the criminal behavior of adults—as a result of which the application in the two separate contexts of the same general principles of "constitutional due process" rationally may, and often will, produce differences in the specific requirements for each situation.