IN RE CHRISTINA M. ET AL.*
(AC 25539)
(AC 25540)

Bishop, DiPentima and Peters, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued April 21—officially released August 2, 2005

*Raymond J. Rigat*, for the appellant (respondent father).

*Cheryl A. Juniewic*, for the appellant (respondent mother).

*Paula D. Sullivan*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*David T. Stone*, for the minor children.

*Opinion*

PETERS, J. Cases involving the termination of parental rights are always difficult. This case highlights that difficulty because, as the trial court found, "the children love their parents and . . . the parents love the children." It also found, however, that "unfortunately, [the]

mother and father cannot or will not make the changes necessary to provide the consistent, nurturing, responsible care that [their daughters] need." Accordingly, the court sought the proper balance between the parents' constitutionally protected interest in the care, custody and control of their children, and the interest of the state, acting as parens patriae, to protect the children's health and safety. It concluded that, pursuant to General Statutes § 17a-112 (j),[1] the state had proven, by clear and convincing evidence, that each parent "had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." The court rendered judgment terminating parental rights, and each parent has appealed.[2] We affirm the judgments of the court.

The petitioner, the commissioner of children and families (commissioner), initiated the present proceedings on October 15, 2002, when she filed petitions for the termination of the parental rights of the respondent mother and the respondent father with respect to each of their three daughters. Each petition recited the undisputed fact that, in earlier proceedings, the parents had

---

[1] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon hearing and notice as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . (3) that . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding, or (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[2] The parents' appeals have been consolidated for consideration by this court.

been found to have neglected each daughter. Each petition then alleged that, despite reasonable efforts to reunite each daughter with her parents, the parents were unable or unwilling to benefit from reunification efforts. Accordingly, each petition requested the court to terminate the parental rights of both parents pursuant to § 17a-112 (j) (3) (B) (ii). After the appointment of separate counsel for the mother, the father and the daughters, and after a three day evidentiary hearing, the court found that the commissioner had proven her allegations and rendered judgments of termination, anticipating the adoption of the daughters.

In their appeals from the judgments terminating their parental rights, the parents have raised three issues for us to consider. First, as a matter of fact, both parents challenge the validity of the court's findings that the commissioner had presented clear and convincing evidence to establish, in accordance with § 17a-112 (j), that, despite efforts by the department of children and families (department) to improve the parents' ability to provide proper care for their daughters, the parents had not achieved sufficient rehabilitation. Second, as a matter of law, both parents fault the court for having failed to appoint, on its own initiative, not only a lawyer to represent the children's legal rights, but also a guardian ad litem to represent their best interests. Finally, as a matter of law, the father also claims that, to protect the procedural due process rights of economically disadvantaged parents, article first, §§ 8 and 10, of our state constitution must be construed to require proof beyond a reasonable doubt of the grounds for termination of parental rights. We disagree with each of these claims.

I

The centerpiece of the parents' appeals is their contention that, in the adjudicative phase of the termination

proceedings,[3] the court improperly found that the commissioner had proven, by clear and convincing evidence, that it would be in the best interests of their three daughters to terminate the parental rights of their parents. Specifically, the parents claim that the court improperly found that (1) the department had made reasonable efforts to reunify their family and (2) each parent had failed to achieve sufficient rehabilitation. Significantly, they do not question the accuracy of the facts recited by the court. They argue instead that the court's findings with respect to their parenting skills were ill-founded because the court failed to take into account the extent to which their poverty impaired their ability to conform to departmental expectations of appropriate parental behavior. We are not persuaded.

General Statutes § 17a-112 (j) sets forth the requirements for termination of parental rights that apply to parents who already have lost their custodial rights with respect to their children. In particular, § 17a-112 (j) (3) (B) (ii) requires that a court find that: (1) the children are neglected; (2) they have been in the custody of the commissioner for at least fifteen months; (3) the parents have "been provided specific steps to take to facilitate the return of the child[ren] to the parent[s] pursuant to section 46b-129"; and (4) the parents have "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age[s] and needs of the child[ren], such parent[s] could assume a responsible position in the [lives] of the child[ren] . . . ." General Statutes § 17a-112 (j).

---

[3] As best we can tell, the parents have not challenged any of the court's dispositional findings. The department apparently has found one adoptive home for the three daughters. It is, however, unclear whether the adopting parents will accede to the court's recommendation that the daughters should be permitted to remain in contact with their parents and their brother. Cf. *Michaud* v. *Wawruck*, 209 Conn. 407, 415–16, 551 A.2d 738 (1988).

The court described the undisputed circumstances that led to the commissioner's initial appointment as the legal custodian of the parents' three daughters. In January, 2000, the two older daughters were taken into the custody of the commissioner as a result of concerns about their safety arising out a domestic violence incident between the mother and the father that led to the father's arrest. Because of this violence and a perceived deficiency in the parenting skills of the mother and the father, on July 12, 2000, these daughters were adjudicated neglected and committed to the commissioner.

On January 26, 2001, the older daughters were reunified with their parents and their newly born sister. Both before and after the reunification, the department provided family reunification services that were intended to help the parents improve their parenting skills. The father successfully completed an anger management program. At that time, there were no concerns about substance abuse[4] or physical abuse, although the department was troubled by household disarray that, in its opinion, raised safety issues.

Reunification came to an end, however, when the department received a new report that the mother and the father had struck each other and their daughters. As a result, the commissioner obtained custody of the three daughters on October 3, 2001. The daughters have never again been united with their parents.

The court also described the factual basis of its finding that the commissioner had proven, by clear and convincing evidence, that the department had satisfied the requirement of § 17a-112 (j) (3) (B) (ii) to take "specific steps . . . to facilitate the return of the child[ren] to the parent[s] . . . ." Family reunification is an important social objective. As our Supreme Court

---

[4] Contrary to many cases involving the termination of parents' rights, there has never been any allegation of drug or alcohol abuse in this case.

recently has reminded us: "[A]n important goal of the child protection statutes, in addition to protecting children from abuse and neglect, is to preserve family integrity by . . . teaching parents the skills they need to nurture and care for their children." *Teresa T.* v. *Ragaglia,* 272 Conn. 734, 754, 865 A.2d 428 (2005).

The court's findings describe a variety of reunification programs that the department offered to the parents to enable them to improve their parenting skills so that they might regain their right to care for their daughters. The parents do not deny that the department engaged the services of numerous professionals, including a clinical psychologist, a parent aide program conducted by United Services, Inc., and supervised visitation programs conducted by EastConn Family Visitation Center and Lighthouse Family Services, Inc. Although the parents attended all the meetings scheduled by the clinical psychologist, the court faulted them for having been less conscientious in participating in other programmatic services, even though some of these sessions were scheduled at their home.[5] They did not accept offers of transportation to other program venues. On occasion, the father gave vent to his frustration by angry, threatening behavior directed at the service providers.

In its third set of findings, the court described the factual background of its finding that the commissioner had proven, by clear and convincing evidence, that the parents had failed to achieve the degree of personal rehabilitation required by § 17a-112 (j) (3) (B) (ii). The court's crucial finding with respect to this issue was that, despite the parents' acknowledged love for their daughters, they "lacked the parenting skills and overall competence to care for the girls on a full-time basis."

[5] For example, in August, 2003, two months before the filing of the termination petitions, the parents failed to keep three appointments with a department social worker at their home.

The court based its finding on numerous reports that the parents' inability to set goals and priorities had an adverse impact on their efforts to provide a safe family home for their daughters. The court cited evidence of inappropriate nutritional decisions and of the father's distaste for academic pursuits. The court was concerned that the parents did not recognize the risk posed to their daughters by the presence of a paternal grandfather who was a convicted and registered sex offender. The court relied on the conclusions of three different service providers that the parents were unable to provide a safe home for their daughters. Significantly, the clinical psychologist, who had interviewed and observed the family at various times, was more pessimistic about their parental capacity in his final report in November, 2003, than he had been nine months earlier.

The court considered and rejected the parents' argument that their skill in parenting their other child, a baby boy, demonstrated their skill in caring for their daughters. It recited evidence that cast doubt on the parents' alleged competence to care for the baby. It also cited other testimony, again undisputed, that the baby was not receiving proper nourishment and had been left in the custody of a person whose reliability was doubtful. More important, relying on expert testimony, it was not persuaded that competence in caring for one child established competence to raise four children.[6] It also noted that a report on family visitation described the parents' inability to interact with the

---

[6] In his evaluation of the family in January, 2003, the clinical psychologist stated his belief that "these parents may be able to parent one or two children with a great many supports for the children and the parents." Accordingly, he then proposed that the oldest daughter "be transitioned back to her parents on a part time basis." That, however, is only a part of the story. Several months later, in a final report, the psychologist abandoned this recommendation because he had been able to obtain "a fuller and deeper picture of what these parents can do and can't do."

daughters because of their preoccupation with their baby.

On appeal, the parents do not challenge the accuracy of any of the facts on which the court relied in its ultimate finding that the commissioner had established, by clear and convincing evidence, the § 17a-112 (j) (3) (B) (ii) requirements for termination of parental rights. They do not claim that the court excluded any evidence to the contrary. Their argument is essentially a plea in avoidance. They maintain that the court's findings were clearly erroneous because the court failed to take account of the special problems presented by their poverty, their cognitive limitations[7] and their responsibility to provide care for their baby son.

In the view of the parents, the department's reunification services were inadequate because, unlike the service provider who testified for the parents,[8] the agencies on which the department relied did not consider providing simple assistance, such as a calendar, to assist them in improving their parental skills. They maintain that the department's service providers were too critical of clutter in their apartment that was caused by their attempt to find clothing for their children by searching through donations that had been made to the Salvation Army. The court was not obligated, however, to find that the parents' disagreement with the department's

---

[7] The clinical psychologist diagnosed both parents as having mental deficits. As a matter of principle, we know of no authority for the proposition that the department must comply with each and every recommendation of its service providers. More important, the psychologist later became persuaded that further reunification services would not improve the parents' ability to care for their daughters.

[8] The court explained why it had assigned little weight to the testimony of this service provider. The court noted that this provider had never observed the parents' interaction with their daughters in person, and had not spoken to other interested professionals, such as the baby's pediatrician or other agencies that were working with the parents. In light of these gaps in this provider's inquiries, the court found her testimony unreliable.

service providers justified their ongoing resistance to the parenting education that was offered to them.

The parents make a similar argument with respect to the court's finding that they had failed to rehabilitate themselves. In addition to reiterating their claim that their successful care for their baby boy demonstrated the adequacy of their parenting skills, the parents claim that the court should have attached greater weight to evidence that showed that they had created a safe environment for all their children. They point to testimony about their improved housekeeping skills. They remind us that, although unmarried, they have maintained their family home for more than eight years. They note that there has been no recurrence of family violence. They suggest that differences about priorities between the parents and their service providers were a barrier to the parents' ability to benefit from the training that the department had offered to them.[9] They cite cases such as *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 661–62, 420 A.2d 875 (1979), for the principle that limited parental resources should not be a consideration in deciding disputes about parental skills.

We presume that all these considerations were presented to the court because the parents have not argued to the contrary. However sympathetic we may be to the parents' economic plight, we cannot reweigh the evidence or find facts. *In re Ashley M.*, 82 Conn. App. 66, 76, 842 A.2d 624 (2004).

We conclude, therefore, that it was proper for the court to find, as § 17a-112 (j) (3) (B) (ii) requires, that the commissioner had established, by clear and con-

---

[9] As an example of the department's lack of sensitivity to their special needs, the parents cite the fact that, on cross-examination, the father was questioned about his practice of obtaining large bags of used clothing from the Salvation Army. The parents viewed this practice as a necessary expedient to clothe their children. The department viewed it as a safety hazard.

vincing evidence, that, despite the training in parental skills that the department had provided, the parents did not have the ability to care for their daughters, either at the time of the termination proceedings or in the immediately foreseeable future.[10] Despite their love for their daughters, the parents have been shown to be unable to protect their daughters from the risks posed by unsafe housing, inadequate nutrition and inappropriate caretakers. The sad fact is that there is a difference between parental love and parental competence.

## II

We turn now to the issues of law that the parents have raised. Both parents argue that their daughters were deprived of their constitutional right to adequate legal representation at trial because, under the circumstances of this case, the court was required to make a dual appointment, an attorney to represent the daughters' legal rights and a guardian ad litem to represent their best interests. In addition, the father argues that, to protect his due process rights under state constitutional law, the trial court was required to adjudicate the merits of the termination petitions by requiring the commissioner to prove her case beyond a reasonable doubt, and this court is required to review the trial court's findings de novo. Concededly, none of these issues was

[10] The trial court relied on the same facts in the dispositional phase of the termination proceedings, in which it concluded that, in the best interests of the daughters, the commissioner would be designated as their legal parent so that they could be placed for adoption. It is apparently contemplated that the daughters will be placed in the same adoptive home. The court recommended to the commissioner that consideration be given to continuing postadoption contact between the daughters and their brother and their parents.

The father challenges the validity of the court's findings on the same grounds advanced to challenge the validity of its findings during the adjudicative phase of the termination proceedings. Because we have already addressed his disagreement with these findings, we need not repeat that discussion here.

raised in the trial court. To the extent that they are entitled to appellate review, we are not persuaded of their merits.

## A

The parents claim that the interests of their daughters did not receive the benefit of the legal representation to which they are constitutionally entitled even though, at the initiation of the termination proceedings, the court appointed an attorney for the daughters. This attorney agreed with the commissioner that the parental rights of the parents should be terminated even though the daughters had expressed their wish for family reunification.[11] In light of this alleged conflict of interest, the parents maintain that the trial court had a constitutional obligation also to appoint a guardian ad litem who would represent the daughters' best interests.[12] We are not persuaded.

Because the parents' claim is constitutional in nature, their failure to raise it at trial is not dispositive if the claim meets the standards set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[13] Applying these standards to the circumstances of this case, we hold that the parents can prevail only if they demonstrate that the court's failure to appoint a guardian ad litem for the daughters, on the court's own initiative,

[11] There was evidence that the daughters' close attachment to their parents had become attenuated by the time of the trial.

[12] *In re Shaquanna M.*, 61 Conn. App. 592, 599, 767 A.2d 155 (2001), establishes that the parents have standing to raise this issue.

[13] Under *Golding*, "a [party] can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the [party] of a fair trial; and (4) if subject to harmless error analysis, the [opposing party] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, supra, 213 Conn. 239–40.

resulted in a clear violation of their daughters' constitutional rights.

This court recently decided whether a failure to appoint a guardian ad litem was plain error requiring reversal of a judgment terminating parental rights. In *In re Brendan C.*, 89 Conn. App. 511, 519–21, 874 A.2d 826 (2005), we held that it was not. We did not, however, decide whether an argument based on constitutional grounds would require a different result. Id., 519 n.3, 522 n.5.

As in *In re Brendan C.*, the parents argue that General Statutes § 46b-129a[14] was enacted to implement the constitutional rights of children to legal representation in termination of parental rights cases. *In re Brendan C.*, supra, 89 Conn. App. 518. Although, by its own terms, the statute addresses the right to counsel in neglect proceedings, we agree with the parents that it is equally

---

[14] General Statutes § 46b-129a provides in relevant part: "In proceedings in the Superior Court under section 46b-129: (1) The court may order the child, the parents, the guardian, or other persons accused by a competent witness with abusing the child, to be examined by one or more competent physicians, psychiatrists or psychologists appointed by the court; (2) a child shall be represented by counsel knowledgeable about representing such children who shall be appointed by the court to represent the child and to act as guardian ad litem for the child. The primary role of any counsel for the child including the counsel who also serves as guardian ad litem, shall be to advocate for the child in accordance with the Rules of Professional Conduct. When a conflict arises between the child's wishes or position and that which counsel for the child believes is in the best interest of the child, the court shall appoint another person as guardian ad litem for the child. The guardian ad litem shall speak on behalf of the best interest of the child and is not required to be an attorney-at-law but shall be knowledgeable about the needs and protection of children. In the event that a separate guardian ad litem is appointed, the person previously serving as both counsel and guardian ad litem for the child shall continue to serve as counsel for the child and a different person shall be appointed as guardian ad litem, unless the court for good cause also appoints a different person as counsel for the child. No person who has served as both counsel and guardian ad litem for a child shall thereafter serve solely as the child's guardian ad litem. . . ."

applicable to termination proceedings. Children who are at risk of removal from their loving parents are entitled to and need the assistance of counsel.

Section 46b-129a authorizes a court initially to appoint an attorney who will serve the *dual* roles of advocate and guardian ad litem for a child. It also provides, however, that "[w]hen a conflict arises between the child's wishes or position and that which counsel for the child believes is in the best interest of the child, the court *shall* appoint another person as guardian ad litem for the child. . . ." (Emphasis added.) General Statutes § 46b-129a. Implicit in the parents' citation of this statute is the claim that it imposes on the court itself a constitutional obligation to recognize the existence of a conflict and to act accordingly. We know of no authority that so holds and the parents have cited none.

Generally speaking, counsel bears responsibility for representing the legal interest of a child while a guardian ad litem must promote and protect the best interest of a child. *In re Tayquon H.*, 76 Conn. App. 693, 706–707, 821 A.2d 796 (2003); but see *Schult* v. *Schult*, 241 Conn. 767, 776–77, 699 A.2d 134 (1997). We adopted rule 1.2 (a) of the Rules of Professional Conduct, which provides that counsel is obligated to "abide by a client's decisions concerning the objectives of representation . . . ." "[W]hen counsel perceives that this obligation is in conflict with the child's actual best interest . . . *counsel* must bring that to the court's attention, and the court, in turn, must appoint a separate guardian ad litem to protect and to promote the child's best interest in the process." (Emphasis added.) *In re Tayquon H.*, supra, 703–704. The authorities cited by the parents in this case similarly agree that *counsel*, rather than the court, has the responsibility for requesting the appointment of a guardian ad litem. See, e.g., A. Webster, Child Protection in Connecticut Courts: Basic Practice and Procedure (1998) p. 17; M. Ventrell, Legal Representa-

tion of Children in Dependency Court: Toward a Better Model—The ABA (NACC Revised) Standards of Practice, 10 NACC Children's Law Manual Series (1999) pp. 167, 174, 180, 183–84.[15]

We conclude, therefore, that the claim fails to satisfy the third prong of *Golding*. The parents have not established that the court's failure to appoint a guardian ad litem, on the court's own initiative, resulted in a clear violation of their daughters' constitutional rights.

As a fallback position, the parents maintain that their daughters' right to proper legal representation was unconstitutionally impaired by *counsel's* failure to ask the court to appoint a guardian ad litem for their daughters. The judgments of the trial court cannot be set aside on this ground without an allegation and a finding of incompetence of counsel. Because the parents did not pursue that route at trial, they cannot pursue it here.

We therefore reject the argument of the parents that the trial court failed to fulfill its constitutional obligation to provide counsel for the daughters. In light of the record before it, the court properly appointed an attorney to represent the daughters' legal interests. Until the court was asked also to appoint a guardian ad litem, that was all that our constitution required the court to do.

B

The father also argues that the trial court's judgments should be set aside because the court failed to respect the rights to due process that are granted to him by our state constitution. For a person in straitened economic circumstances, like himself, he maintains that our state

---

[15] See also 1 A. Haralambie, Handling Child Custody, Abuse and Adoption Cases (Rev. Ed. 1993) § 11.23, p. 484 (2004 Cum. Sup.); N. Moore, "Conflicts of Interest in the Representation of Children," 64 Fordham L. Rev. 1819, 1842–43 (1996).

constitution (1) requires the commissioner to prove her case for termination of parental rights beyond a reasonable doubt and (2) requires this court to review the trial court's findings of fact de novo instead of undertaking the customary inquiry into whether the findings were clearly erroneous.[16] Because of the constitutional nature of these claims, they are not barred from appellate consideration by the father's failure to raise them at trial. *State* v. *Golding*, supra, 213 Conn. 239–40. We are, however, unpersuaded of their merits.

It is common ground that, under our state constitution, the father's constitutional claims may be valid even if similar claims have been rejected as a matter of federal law. Federal constitutional and statutory law establishes a threshold—but not a ceiling—for the protection of due process rights. *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992).

In addressing the merits of state constitutional claims, we have been guided by the analytic framework set out in *Geisler*.[17] The father's constitutional claims fall far short of the *Geisler* standards.

1

We start with the father's claim that our constitution requires the factual underpinnings underlying a termination of parental rights to be proven, not by clear and convincing evidence, but by proof beyond a reasonable doubt. In support of this claim, the father has cited the

---

[16] The father recognizes that federal constitutional law provides no support for either of these claims.

[17] *Geisler* identifies six factors relevant to the analysis of a state constitutional claim. They are: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies. *State* v. *Geisler*, supra, 222 Conn. 685.

due process provisions of article first, §§ 8[18] and 10,[19] of our state constitution. His only analysis of these provisions focuses on the fact that in one state, New Hampshire, the courts have adopted the standard of proof that he advocates.[20]

The Supreme Court of New Hampshire repeatedly has stated that "the loss of one's children can be viewed as a sanction more severe than imprisonment." *State v. Robert H.*, 118 N.H. 713, 716, 393 A.2d 1387 (1978), overruled in part on other grounds by *In re Craig T.*, 147 N.H. 739, 744–45, 800 A.2d 819 (2002), but followed in *In re Noah W.*, 148 N.H. 632, 636, 813 A.2d 365 (2002), and *In re Baby K.*, 143 N.H. 200, 205, 722 A.2d 470 (1998). In light of the significance of this interest, to terminate parental rights, "due process requires proof beyond a reasonable doubt, the same burden of proof required for a criminal conviction and incarceration." (Internal quotation marks omitted.) *In re Noah W.*, supra, 636.

[18] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

[19] Article first, § 10, of the constitution of Connecticut provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[20] In his brief, the father also cites a decision of the Maine Supreme Court, *Danforth v. State Dept. of Health & Welfare*, 303 A.2d 794 (Me. 1973), as additional support for his position. In that case, the court declined to categorize termination proceedings as either "civil" or "criminal." Id., 799. It observed, nonetheless, that, "[i]n some instances the loss of one's child may be viewed as a sanction more severe than imprisonment." Id., 800. The court also noted that "the full panoply of the traditional weapons of the state are marshaled against the defendant parents"; id., 799; in neglect proceedings. In light of these considerations, the court concluded that, because the right of parents to maintain custody of their children is constitutional in nature, due process requires that counsel be appointed at the state's expense in termination proceedings involving indigent parents. Id. Significantly, the court in *Danforth* did not consider whether the nature of termination proceedings required the state to prove its case beyond a reasonable doubt.

Undeniably, proceedings for the termination of parental rights put important constitutional rights at risk. "[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court." *Troxel* v. *Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it. If the State prevails, it will have worked a unique kind of deprivation. . . . A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." (Internal quotation marks omitted.) *Santosky* v. *Kramer*, 455 U.S. 745, 759, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

Nonetheless, we are not persuaded that our constitution requires us to equate terminations of parental rights with criminal convictions. Indeed, our Supreme Court has already decided that termination proceedings are not criminal or quasi-criminal matters. *In re Samantha C.*, 268 Conn. 614, 659, 847 A.2d 883 (2004).

Other than relying on the law of New Hampshire, with which we disagree, the father has not presented a reasoned argument for his novel interpretation of the due process provisions of our state constitution. This is too flimsy a foundation for declaring the standard of proof set out in § 17a-112 (j) to be unconstitutional. We do not lightly declare any part of a statute to be unconstitutional. "[A] validly enacted statute carries with it a strong presumption of constitutionality . . . ." (Internal quotation marks omitted.) *Alexander* v. *Commissioner of Administrative Services*, 86 Conn. App. 677, 684, 862 A.2d 851 (2004).

Alternatively, the father argues that analysis of his constitutional rights under the balancing test of

*Mathews* v. *Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), supports his contention that, in termination proceedings, the commissioner must prove her case beyond a reasonable doubt. That argument was put to rest in *In re Tyqwane V.*, 85 Conn. App. 528, 537–39, 857 A.2d 963 (2004), in which we considered and rejected it. True, our analysis focused on the due process requirements of our *federal* constitution. See id., 536–37. The father has not, however, provided us with a basis for finding that applying the *Mathews* test to the provisions of our state constitution would lead to a different result.

We conclude, therefore, that the legislature's choice of proof by clear and convincing evidence is consistent with the mandates of our state constitution as it is with the mandates of our federal constitution. Review of the relevant case law demonstrates that proof by clear and convincing evidence is a demanding standard of proof. See, e.g., *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 648. There is no basis for the father's assertion that its use has resulted in judicial rubber-stamping of petitions for termination of parental rights.

2

The father has raised one additional constitutional issue. For much the same reasons that he advanced in his argument about the standard of proof at trial, he claims that the prevailing standard of reviewing judgments in termination of parental rights cases is too deferential. In his view, appellate review should include de novo review of the trial court's findings of fact. He concedes that a similar claim has already been rejected in *In re Tyqwane V.*, supra, 85 Conn. App. 541–42. He distinguishes that case by noting that it relied on federal constitutional law, while his argument is based on state constitutional law.

This claim need not long detain us because, for two independent reasons, it is unreviewable. Procedurally, his claim is untimely. Substantively, it has not been briefed adequately.

The father's claim is untimely because he failed to raise it at trial or in his initial brief on appeal. A reply brief is not the proper vehicle for a new argument. "Our practice requires an appellant to raise claims of error in his original brief, so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument. Although the function of the appellant's reply brief is to respond to the arguments and authority presented in the appellee's brief, that function does not include raising an entirely new claim of error." (Internal quotation marks omitted.) *State* v. *Garvin*, 242 Conn. 296, 312, 699 A.2d 921 (1997).

The father's claim is not reviewable because it has not been briefed properly. The father has provided no support whatsoever for his claim that our state constitution requires us to adopt a heightened standard of appellate review in termination proceedings. He has not identified the constitutional provision on which he relies. He has cited no case, anywhere, that has so held. In short, he has not undertaken any analysis, of any kind, in support of this claim. An improperly briefed issue is deemed to have been abandoned. *State* v. *Gaines*, 196 Conn. 395, 397 n.2, 493 A.2d 209 (1985).

### III

Like every other court in this country, we are mindful of our responsibility to respect and protect the constitutional rights of parents, rich or poor, to make decisions about the care, custody and control of their children. Like all other rights, however, these rights can be lost. "The family is not . . . beyond regulation in the public interest, and the rights of parenthood are not beyond

limitation." *Lehrer* v. *Davis*, 214 Conn. 232, 237, 571 A.2d 691 (1990); see also *Prince* v. *Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944).

Trial courts must take the laboring oar to maintain the proper balance between parental rights to family integrity and the state's responsibility to protect the rights of children to grow up in a safe and nurturing environment. The trial court in this case undertook this responsibility with articulated appreciation of its difficulties as well as a firm commitment to finding the best possible resolution of the painful disparity between these parents' love for their children and their ability to provide them with the nurturing care to which they are entitled.

The judgments are affirmed.

In this opinion the other judges concurred.

