939 A.2d 9 (2008)
105 Conn.App. 502
In re T.K.[*]
No. 28458.
Appellate Court of Connecticut.
Argued November 27, 2007.
Decided January 29, 2008.
Penn Rhodeen, New Haven, for the appellants (respondents).
Jon Femia, assistant attorney general, with whom, on the brief, were Richard Blumenthal, attorney general, and Susan T. Pearlman and Jessica Gauvin, assistant attorneys general, for the appellee (petitioner).
GRUENDEL, LAVINE and FOTI, J.
LAVINE, J.
"Parents have a constitutionally protected right to raise and care for their own children. . . . This right is not free from intervention by the state, however, when the continuing parens patriae interest of the state in the well being of children is deemed by law to supersede parental interests." (Citation omitted.) In re Juvenile Appeal (83-DE), 190 Conn. 310, 318-19, 460 A.2d 1277 (1983); see Santosky v. Kramer, 455 U.S. 745, 766, 102 S.Ct. 1388; 71 L.Ed.2d 599 (1982). In furtherance of the state's parens patriae interest, the legislature *10 has enacted a comprehensive statutory scheme; see General Statutes § 46b-120 et seq.; to protect children who have been adjudicated neglected due to either the conscious acts or omissions of a parent; see, e.g., In re Allison G., 276 Conn. 146, 164, 883 A.2d 1226 (2005); or the personal limitations of a parent. See, e.g., In re Migdalia M., 6 Conn.App. 194, 205-207, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986). The case on appeal demonstrates how that statutory scheme permits the state to intervene to protect the well-being of a child, to assist troubled parents who are receptive to services and to preserve the family. See General Statutes § 17a-101(a).
The respondent parents[1] appeal from the judgment of the trial court adjudicating their child neglected. On appeal, the respondents claim that (1) there was insufficient evidence, as a matter of law, from which the court could conclude that the child was neglected and (2) one of the court's factual findings was clearly erroneous. We affirm the judgment of the trial court.
The following background is relevant to our review. The child, the respondents' first, was born on November 30, 2005. During the period of her lying-in, the mother told a hospital social worker that she had recurring thoughts of harming herself and the child. The department of children and families (department) received a referral concerning the child on December 13, 2005. On December 15, 2005, the petitioner, the commissioner of children and families, filed a neglect petition[2] and a motion for an order of temporary custody. That same day, the motion for temporary custody was granted by the court, Conway, J. The petitioner filed the neglect petition premised on the doctrine of predictive neglect.[3] See In re Michael D., 58 Conn.App. 119, 123-25, 752 A.2d 1135, cert. denied, 254 Conn. 911, 759 A.2d 505 (2000). On December 23, 2005, the order of temporary custody was vacated by the court, B. Kaplan, J., pursuant to an agreement under which the mother would have only supervised contact with the child. The child's maternal grandmother was approved as a supervisor, and the respondents were ordered to undergo *11 psychological evaluations. Following a four day trial, on November 30, 2006, Judge Kaplan adjudicated the child neglected, as she was permitted to live under conditions, circumstances or associations injurious to her well-being, pursuant to § 46b-120(9)(C).[4] Judge Kaplan ordered a six month period of protective services from May 30 to November 30, 2006. The respondents filed a motion for reargument, which the court denied. This appeal followed.
We are mindful of the purpose of a finding of neglect. "[A]n adjudication of neglect relates to the status of the child and is not necessarily premised on parental fault. A finding that the child is neglected is different from finding who is responsible for the child's condition of neglect. Although [General Statutes] § 46b-129 requires both parents to be named in the petition, the adjudication of neglect is not a judgment that runs against a person or persons so named in the petition; [i]t is not directed against them as parents, but rather is a finding that the children are neglected. . . ." (Emphasis in original; internal quotation marks omitted.) In re Jeffrey C., 64 Conn.App. 55, 62, 779 A.2d 765 (2001), rev'd on other grounds, 261 Conn. 189, 802 A.2d 772 (2002); see also In re Allison G., supra, 276 Conn. at 164, 883 A.2d 1226 (focal point of neglect petition is not condemnation of parents but status of child). The application of a statute to a particular set of facts is a question of law to which we apply a plenary standard of review. See In re Nasia B., 98 Conn.App. 319, 328, 908 A.2d 1090 (2006).

I
The respondents' first claim is that the court improperly determined that the child was neglected because she was being permitted to live under conditions, circumstances or associations injurious to her well-being.[5] We disagree.
The court found by the preponderance of the evidence the following facts that occurred prior to the filing of the neglect petition. "[T]he facts seem almost undisputed that after the child was born and she was in the hospital, that the mother reported to the staff that she had obsessive thoughts and anxieties. The mother had thoughts of hurting herself and also hurting the baby. Those thoughts were reported to the [department]. The nurses were also concerned about the boundaries the mother had with the child while the mother also had . . . a higher level of anxiety . . . than a normal parent of a newborn. The father also had some symptoms, and the mother said that if she dropped the baby, then this would be over. And there was also an incident at the hospital involving the father and a mattress.[6]
"All of these factors taken into consideration, and especially the testimony of the father, who, unlike the other people, was aware of his wife's thoughts about hurting herself, and when he heard about her *12 thoughts of hurting the child, was himself overly concerned and fearful for the welfare of the child, as was the mother at that time. That type of testimony is leading the court to its conclusion today. So, I adjudicate the child neglected."[7] (Emphasis added.)
"Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) In re Jessica S., 51 Conn.App. 667, 674-75, 723 A.2d 356, cert. denied, 251 Conn. 901, 738 A.2d 1090 (1999). Having reviewed the evidence presented at trial, we conclude that the court's decision adjudicating the child neglected because she was being permitted to live under conditions, circumstances or associations injurious to her well-being was not clearly erroneous.
The respondents were referred to S. David Bernstein,[8] a clinical forensic psychologist, for psychological evaluations. The court had identified eight concerns, including the emotional and psychological status of the respondents, the present relationship between the respondents, the nature of the marital relationship between the respondents, who will provide the child's primary care, whether the caregivers require services, the nature and extent of the extended family relationships and whether major figures in the child's life have intellectual, emotional or physical characteristics that may impair their ability to develop appropriate relationships or to discharge their child care responsibilities.
The evidence discloses that Bernstein conducted clinical interviews with the respondents individually and together with the child in January, 2006. Bernstein conducted collateral interviews with the mother's psychiatrist and the couple's marriage counselor. He also administered the Child Abuse Potential Inventory[9] and the Wechsler Abbreviated Scale of Intelligence to both of the respondents and the Minnesota Multiphasic Personality Inventory to the mother. In addition, he reviewed a number of department and court records concerning the respondents.
*13 Bernstein's report indicates, among other things, that at all relevant times, the mother was a twenty-six year old high school graduate who had earned two certificates from a community college and studied at a seminary abroad. She reported having grown up in a loving home. At the time of the interview, she had a job selling newspapers and Mary Kay cosmetics. The mother has had obsessive thoughts of harming herself since she was seven years old, and she has been diagnosed with obsessive compulsive disorder. She regularly sees a psychiatrist, who prescribes for her antidepressant and antipsychotic medications. Despite her history of suicidal ideation, the mother has never acted on those thoughts, nor has she acted on her troubling thoughts as they relate to the child. She knows that harming herself is wrong, and she believes that she is a good person.
Following the birth of the child, the mother had obsessive thoughts of harming the child and was feeling overwhelmed by the new responsibility. She informed the father, who was aware of her obsessive compulsive disorder, of her thoughts. He advised her to speak with the hospital social worker about her thoughts because the social worker might be of help. The social worker reported the mother's anxieties to the physician responsible for discharging the mother and child. The physician indicated that the department would have to become involved. The hospital social worker spoke with the respondents and the maternal grandparents in an effort to arrange a supportive plan for caring for the child but believed that the maternal grandparents minimized the situation. According to the father, the mother's thoughts of dropping the child or drowning her continued after the mother was discharged from the hospital.[10]
The father is a twenty-eight year old college graduate who works as a computer technology support engineer. According to him, he grew up in a home in which he was subjected to physical and psychological abuse. He also reported that he had been hospitalized twice when he was a teenager for anger and violent behavior for which he was treated medically and therapeutically. In the past, he took medication to deal with his anger and anxiety. The father appeared excitable to Bernstein and reported feeling angry, irritable, isolated, sad and having problems with his self-image. He, too, has suicidal thoughts. The father had been told recently by a psychiatrist that he would benefit from medication.
Bernstein also obtained a marital history from the respondents. They met in February, 2003, when they were introduced by friends in anticipation of marriage, and were married in November, 2003. When the mother discovered her pregnancy in March, 2005, she believed that she was not ready to have a child, but the father was excited. The respondents lived in an apartment prior to the birth of the child, but they had been living with the child's maternal grandparents in another city since the child was born. Both of the respondents reported conflict within their marriage ranging from vociferous arguments to physical altercations. When asked what typically prompted conflicts between the two, the father stated, "I'm usually not happy with the way she's doing something, and I try to, maybe in a nice way, maybe not in a nice way, to get her to do things the way I want them to be done, and she challenges me, and we end up *14 getting into an argument." (Internal quotation marks omitted.) He also stated that the respondents had arguments in the presence of the child and that the mother has cried in front of the child. The mother described the source of their conflicts as the father's getting "very particular about things, and I'm very sensitive, so I would get upset." (Internal quotation marks omitted.) The mother's psychiatrist and the marriage counselor both indicated that the father's anxiety often triggers the mother's obsessive thoughts. As a result of marriage counseling, the respondents reported that they were communicating better. The psychiatrist and marriage counselor agreed that therapy was helping the respondents.
The mother's psychiatrist was of the opinion that the mother would never act on her obsessive thoughts of harming herself or the child because she had not done so in the past. Bernstein's testimony at trial, however, expressed a different view: "So, the question then becomes, well, is there a first time for everything? And I think that's the root of this, and the answer is yes, there is a first time for everything. But there is nothing here to indicate that [the mother] has ever acted on any of these compulsions. Not saying, I mean, nobody can read anyone's mind and know if this will occur. What we do know is that these thoughts are clearly associated with anxiety."
"Our statutes clearly and explicitly recognize the state's authority to act before harm occurs to protect children whose health and welfare may be adversely affected and not just children whose welfare has been affected." In re Michael D., supra, 58 Conn.App. at 124, 752 A.2d 1135. General Statutes § 17a-101(a) provides: "The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family." (Emphasis added.) In re Michael D., supra, at 123, 752 A.2d 1135.
On the basis of our review of the evidence, we conclude that as a matter of law, there was sufficient evidence by which the court reasonably could have found by a preponderance of the evidence that the child was neglected by reason of being permitted to live under conditions, circumstances or associations injurious to her well-being. Compare In re Brianna C., 98 Conn.App. 797, 803, 912 A.2d 505 (2006). For almost twenty years, the mother has had obsessive thoughts of harming herself, and the stress and responsibility of the newborn child caused her to obsess about hurting the child. She shared these thoughts with the father, who was so concerned that he told the mother to seek help from the hospital social worker. The record also discloses that the father has had suicidal thoughts himself and that he would benefit from medical treatment. Furthermore, prior to the time they entered marriage counseling, the respondents' marital relationship was strained, resulting in verbal and physical conflict. Both the mother's psychiatrist and the marriage counselor noted that the father's anxious nature had a tendency to exacerbate the mother's obsessive thoughts. Although the department approached the maternal grandparents to be a resource for the respondents, the maternal grandparents minimized the situation. The situation called out for intervention, as the circumstances into which the child was born put her well-being at risk. The fact *15 that the respondents welcomed and benefited from the services provided to them, and that the family was reunified, is itself a vindication of the court's judgment.
On appeal, the respondents argue that this is not a case to which the doctrine of predictive neglect applies. The respondents claim that the elements of predictive neglect are (1) a serious prior history of neglectful or abusive parenting of one or more children or (2) a serious inability or unwillingness of the parents to accept, cooperate with or benefit from services necessary to help them care for their child. We disagree. Although many of the cases on which the respondents rely for that argument concerned families in which older children had been harmed or permitted to be harmed by a parent, neither the legislature nor the courts of this state have set forth such requirements. If the first of the respondents' arguments were accepted, no firstborn child could ever be adjudicated neglected under the doctrine of predictive neglect because the parents could have no history of prior abuse. Our child protection laws are designed to prevent injury to the welfare of a child, not to wait until it occurs. As to the second of the elements asserted by the respondents, again their argument is predicated on the facts of the case law on which they rely. Just because a parent has never refused services does not mean that the services are not warranted, as this case illustrates. Just because services are accepted, on the other hand, does not mean that a child cannot be deemed neglected under our law. The doctrine of predictive neglect is grounded in the state's responsibility to avoid harm to the well-being of a child, not to repair it after a tragedy has occurred.
For all of the foregoing reasons, we conclude that there was sufficient evidence, as a matter of law, from which the court could have adjudicated the child neglected.

II
The respondents' second claim is that the court made a factual finding that is clearly erroneous. We need not decide from the conflicting evidence in the record whether the factual finding was clearly erroneous. Even if the court's finding was erroneous, the error was harmless.
In its memorandum of decision, the court stated that "there also was an incident at the hospital involving the father and a mattress." The respondents claim that the finding is clearly erroneous because the incident did not take place at the hospital but in the home of the maternal grandparents. The following facts appear to underlie the respondents' claim. Due to some health issues of her own, the child remained in the hospital after the mother was discharged, and the respondents spent long hours at the hospital. One morning, the father was up and eager to return to the hospital, but the mother had lingered in bed. The father picked up the mattress causing the mother to fall to the floor.
In our view, it does not matter where this incident occurred because the respondents do not deny that it occurred. This incident, more than any other, underscores the conflict in the respondents' relationship, which, if not addressed, would have put the welfare of the child at risk. Even if we assume, without deciding, that the court found the wrong locus of the mattress incident, the error was harmless in view of the other ample evidence on which the court relied in adjudicating the child neglected. See Doody v. Doody, 99 Conn. App. 512, 518, 914 A.2d 1058 (2007).
The judgment is affirmed.
In this opinion the other judges concurred.
NOTES
[*] In accordance with the spirit and intent of General Statutes § 46b-142(b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.
[1] In this opinion, we refer to the respondents collectively as the respondents and individually as the mother or the father.
[2] The petition was filed pursuant to General Statutes § 46b-120(9), which alleges in relevant part that "a child . . . may be found `neglected' who . . . (B) is being denied proper care and attention, physically, educationally, emotionally or morally, or (C) is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child. . . ."

The court specifically stated that it did not find that the child had been denied proper care and attention pursuant to § 46b-120(9)(B).
[3] In the social study the department submitted to the court, the following reasons for the petition were listed:

"1. On 12/13/05, mother reported to hospital staff that she had obsessive compulsive disorder and anxiety. Mother also reported having thoughts of hurting herself and the baby.
"2. On 12/14/05, mother reported to a [department] Social Worker that [she] continued to have thoughts of hurting herself and the baby and believed these thoughts to be normal.
"3. While in the hospital, it was noted that mother did not want to feed the baby, was reluctant to participate in the child's care and was often instructed to be gentle with the infant when holding her.
"4. The father also has symptoms of [obsessive compulsive disorder] and was not involved in counseling or prescribed any medications.
"5. The maternal grandparents minimized the seriousness of mother's statements and her mental health."
[4] The adjudication period was from November 30, 2005, to December 15, 2005.
[5] At no time did the respondents object to the intervention and services offered by the department, and the court commended them for their openness and receptivity. It appears to us that the term neglected child is most troubling to the respondents, as they view it as stigmatizing. Although we are sympathetic to the respondents' concern under the facts of this case, it is not the function of the judiciary to alter the language of a statute enacted by the legislature. What is important, however, is not the terminology that is used to define a child whose welfare is at risk, but the fact that the family has been in need of services that the department can offer.
[6] See part II.
[7] The court also stated with respect to the disposition of the case that "never since I have been in Juvenile Court have I seen two parents who have cooperated more fully, done everything that they [were] supposed to and have formed a loving relationship with the child than I have seen here today. The court feels that it is in the child's best interest that there be a period of protective supervision. Referring to Dr. S. David Bernstein's testimony of six months ago at May 30, he felt that . . . they should stay under the control of [the department] so they could receive [the department's] guidance and they could oversee them for a period of six months. Coincidentally, the sixth month period of protective supervision would be today. Therefore, the court feels that a period of protective supervision is in order and that protective supervision will end at five o'clock, November 30, 2006."
[8] The court qualified Bernstein as an expert witness.
[9] The father responded to some of the items on the inventory of child abuse in a manner consistent with individuals who have physically abused their children. There is no evidence in the record, however, that he actually had abused the child. The mother did not respond in a manner consistent with individuals who physically abuse their children.
[10] Due to medical issues not related to this appeal, the child remained in the hospital until December 15, 2005.