# IN RE ANTHONY A.*
## (AC 28658)

McLachlan, Lavine and Robinson, Js.

Argued January 23—officially released March 18, 2008

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Gary J. Wilson*, with whom, on the brief, was *Daniel C. Ford*, for the appellant (respondent mother).

*Colleen Broderick*, assistant attorney general, with whom were *Susan T. Pearlman* and *Stephen G. Vitelli*, assistant attorneys general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellee (petitioner).

*David B. Rozwaski*, for the minor child.

*Opinion*

LAVINE, J. The respondent mother[1] appeals from the judgment of the trial court finding the child neglected pursuant to General Statutes § 46b-120 (9) (B) and (C). On appeal, the respondent claims that the court improperly found that the child was neglected on the date the neglect petition was filed. We disagree and, therefore, affirm the judgment of the trial court.

The court made the following findings of fact in its memorandum of decision filed on March 19, 2007, after a trial held on several days in January and February, 2007. The respondent has suffered from a serious psychiatric disorder for a number of years. When she learned that she was pregnant in July, 2005, the respondent stopped taking her prescribed medication and receiving therapy. During a prenatal visit, a social worker recommended that the respondent reconnect with REACH, a therapy program she had attended for treatment of her disorder. The respondent failed to heed that advice.

---

[1] Although the neglect petition included allegations against the child's father, only the mother is a party to this appeal. We refer to her as the respondent.

The respondent had lived in her own apartment until shortly before the child was born, when she returned to her parents' home so that they could help her care for the child. The respondent went into labor on February 28, 2006. She went to the emergency room of a hospital, refused treatment and returned to her parents' home. Later that evening, she became psychotic and locked herself in a bathroom. Her parents called police and emergency medical technicians for help. The respondent was violent, and she needed to be restrained. She was taken to a hospital where she gave birth to the child the following day, March 1, 2006.

A psychiatrist evaluated the respondent on March 1, 2006, and determined that she was not acutely psychotic, although she had symptoms of her underlying disorder. The psychiatrist recommended that the respondent take medication, but she refused to do so. On March 3, 2006, a social worker (investigator) from the department of children and families (department) met with the respondent after a hospital social worker made a referral to the department. The conversation the investigator had with the respondent upset the respondent, and the respondent requested that her mother come to the hospital. The investigator met with the respondent's mother, herself a department employee, and the two developed a plan of supervised care for the child. The respondent's parents would alternate supervising the respondent and the child. The respondent's mother also volunteered to take leave from her employment to care for the respondent and the child. Because the respondent had not taken medication for her illness for nine months and had a psychotic episode the night before the child was born, the investigator stated that the respondent should live with a relative until the respondent was again taking her medication, her psychosis had been stabilized and she was able to care for the child safely.

When the investigator and the respondent's mother discussed those plans with the respondent, the respondent became enraged and accused her mother of trying to steal her child. She refused to approve the plan. The psychiatrist who had evaluated the respondent on March 1, 2006, evaluated her again on March 3, 2006, and found that the respondent was delusional and paranoid. She was unable to make decisions for herself or care for her newborn child. The psychiatrist issued an emergency order committing the respondent to an inpatient psychiatric hospital for up to fifteen days. That same day, March 3, 2006, the department invoked a ninety-six hour hold on the child. At the time, the child's father was incarcerated. The child was placed in the care of the respondent's parents on March 6, 2006. The petitioner, the commissioner of children and families, filed the neglect petition at issue on March 7, 2006.

On the basis of the evidence presented, the court found that the petitioner had met her burden by the preponderance of the evidence that the child was neglected on the date the petition was filed. Both of the child's biological parents, the only persons with legal authority over the child, were institutionalized on March 7, 2006, and were not able to provide the child with proper care and attention, physically and emotionally. Moreover, the respondent had two recent psychotic episodes. Because she had not taken medication during her pregnancy and in view of her postpartum state, the respondent was at risk of psychotic behavior. According to the respondent's psychiatrist, the respondent's heightened risk of psychotic behavior would last for ninety days following the child's birth.

The court found by the preponderance of the evidence that the respondent was unstable at the time the neglect petition was filed and that her parents were unable to prevent or control her psychotic episodes. There was nothing, such as a court order, to prevent

the respondent from returning to her parents' home when her emergency psychiatric commitment expired. The petitioner, therefore, had a legitimate concern for the safety of the child if the respondent returned to her parents' home.[2] The court found that the child was neglected on the date the petition was filed because he was denied proper care and attention, physically and emotionally, due to the potential for him to live under conditions, circumstances or associations injurious to his well-being. See General Statutes § 46b-120 (9) (B) and (C).[3]

On appeal, the respondent claims that her constitutional right to family integrity under the federal constitution and her right to equal protection pursuant to the constitution of Connecticut, as amended, which forbids discrimination on the basis of a person's mental disability, were denied. Neither of these claims was raised at trial and neither is adequately briefed. We therefore decline to review them. See *In re Christina M.*, 90 Conn. App. 565, 584, 877 A.2d 941 (2005), aff'd, 280 Conn. 474, 908 A.2d 1073 (2006). In her brief, the respondent essentially argues that the court's finding that the child was neglected at the time the petitioner filed the neglect petition is clearly erroneous.

"Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review.

[2] The respondent disputed that the child was neglected because the respondent's family had a plan in place for his care. The court pointed out that the issue to be decided was whether, on the basis of a preponderance of the evidence, there was sufficient evidence to find that the child was neglected on the date the neglect petition was filed. Furthermore, the record indicates that the respondent did not agree to let her parents take the child home when she was unable to leave the hospital.

[3] General Statutes § 46b-120 (9) provides in relevant part: "[A] child or youth may be found 'neglected' who . . . (B) is being denied proper care and attention, physically, educationally, emotionally or morally, or (C) is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth . . . ."

The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *In re Jessica S.*, 51 Conn. App. 667, 674–75, 723 A.2d 356, cert. denied, 251 Conn. 901, 738 A.2d 1090 (1999).

"[A]n adjudication of neglect relates to the status of the child and is not necessarily premised on parental fault. A finding that the child is neglected is different from finding who is responsible for the child's condition of neglect. Although [General Statutes] § 46b-129 requires both parents to be named in the petition, the adjudication of neglect is not a judgment that runs against a person or persons so named in the petition; [*i*]*t is not directed against them as parents*, but rather is a finding that the children are neglected . . . ." (Emphasis in original; internal quotation marks omitted.) *In re T.K.*, 105 Conn. App. 502, 505–506, 939 A.2d 9 (2008). The focal point of a neglect petition is not a condemnation of the parents but a determination of the status of the child. *In re Allison G.*, 276 Conn. 146, 164, 883 A.2d 1226 (2005).

Here, the respondent does not contest the court's underlying finding of facts with respect to her mental health and her circumstances at the time of the child's birth or that she was institutionalized on the date the petition was filed. Her argument is that on March 7, 2007, the child was not denied proper care and attention because he was safely in the care of his maternal grandparents. We review the application of a statute to a particular set of facts by the plenary standard of review.

See *In re Nasia B.*, 98 Conn. App. 319, 328, 908 A.2d 1090 (2006).

In this case, the court found that on the date the petition was filed, the respondent had a history of mental illness and that she had not taken her medication or received other therapy during her pregnancy. The respondent had rejected medical advice that she take her medication following the birth of the child. On March 3, 2006, a psychiatrist determined that the respondent was unable to make decisions on her own behalf or to care for the child. A fifteen day emergency psychiatric commitment was ordered for the respondent. Moreover, the respondent's parents were not able to control the respondent when she was in the midst of a psychotic episode. The court also found that there was no court order preventing the respondent from entering her parents' home and coming in contact with the child.[4] The child's father was incarcerated.

"Our statutes clearly and explicitly recognize the state's authority to act before harm occurs to protect children whose health and welfare may be adversely affected and not just children whose welfare has been affected. . . . The public policy of this state is: To protect children whose health and welfare *may* be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of *suspected* child abuse, investigation of such reports by a social agency, and provision of services, where needed,

---

[4] At the dispositional phase of the proceeding held on March 21, 2007, the court rendered judgment in accordance with an agreement that the respondent and the child's father share joint legal guardianship of the child with the respondent's parents, and that the child live with the respondent and the respondent's parents.

to such child and family." (Citation omitted; emphasis in original; internal quotation marks omitted.) *In re T.K.*, supra, 105 Conn. App. 511–12.

On the basis of our review of the record and the court's memorandum of decision, we conclude that the court's finding that the child was neglected on March 7, 2006, was not clearly erroneous. The fact that the child was in the care of the respondent's parents at that time and that he was not harmed does not change the analysis. Both the respondent and the child's father were institutionalized on that date, and no other person had legal authority to care for the child. Furthermore, the respondent's psychiatric state was not expected to stabilize for ninety days following the birth of the child. There was nothing to prevent the respondent from returning to her parents' home, where the child was living, when she was released from the fifteen day emergency psychiatric commitment. See General Statutes § 46b-120 (9) (C).

The judgment is affirmed.

In this opinion the other judges concurred.