IN RE FRANCISCO R.*
(AC 29397)

Harper, Robinson and West, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued October 20—officially released December 9, 2008

*Thomas B. Pursell,* for the appellant (respondent father).

*Amor C. Rosario,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney

general, and *Susan T. Pearlman* and *Jessica Gauvin*, assistant attorneys general, for the appellee (petitioner).

*Opinion*

WEST, J. This appeal concerns an adjudication of neglect of a child under the doctrine of predictive neglect.[1] Specifically, the respondent father[2] appeals from the judgment of the trial court finding the child neglected under General Statutes § 46b-120 (9) (B) and (C). On appeal, the respondent claims that the court improperly found that the child was neglected on the date that the neglect petition was filed. We do not agree and, therefore, affirm the judgment of the trial court.

At the outset, we must consider whether there is an adequate record for review. An adequate record usually includes either a memorandum of decision or a transcript signed by the trial judge. Practice Book § 64-1. Also, the appellant is responsible for providing such to this court. *Chase Manhattan Bank/City Trust* v. *AECO Elevator Co.*, 48 Conn. App. 605, 607, 710 A.2d 190 (1998); Practice Book § 61-10. The respondent did not provide this court with either a memorandum of decision or a signed transcript. He did provide, however, an unsigned transcript of the proceeding. "On occasion, we will entertain appellate review of an unsigned transcript when it sufficiently states the court's findings and conclusions." *In re Anthony E.*, 96 Conn. App. 414,

---

[1] "Our statutes clearly and explicitly recognize the state's authority to act *before* harm occurs to protect children whose health and welfare may be adversely affected and not just children whose welfare has been affected." (Emphasis added.) *In re Michael D.*, 58 Conn. App. 119, 124, 752 A.2d 1135 (2000), cert. denied, 254 Conn. 911, 759 A.2d 505 (2002); see also *In re T.K.*, 105 Conn. App. 502, 513, 939 A.2d 9, cert. denied, 286 Conn. 914, 945 A.2d 976 (2008).

[2] Although the neglect petition included allegations against the child's mother, only the respondent father is a party to this appeal. We refer to him as the respondent.

417, 900 A.2d 594, cert. denied, 280 Conn. 914, 908 A.2d 535 (2006). We have reviewed the transcript of this case and conclude that it provides an adequate record for our review.

The following undisputed facts and procedural history are disclosed in the record and relevant to the respondent's appeal. The respondent is the father of three daughters, as well as that of the child adjudicated neglected in the present action.[3] On June 12, 2007, Stacey Falk, a department of children and families (department) investigator social worker (investigator), interviewed two of the respondent's daughters, ages thirteen and fifteen, in response to allegations that they had made to their mother that the respondent sexually assaulted them on several occasions. During the interview, each girl alleged that the respondent repeatedly had sexually assaulted them. Each girl told Falk that the respondent had made full penile penetration with them both vaginally and anally.[4] Falk also learned that the respondent currently was residing with the child, the child's mother and the mother's two other children, an eight year old girl and a ten year old boy. Falk

[3] The respondent and child involved in this matter are part of a larger family constellation that includes the respondent, the child, the child's mother and her two children from a previous relationship, all of whom lived in the same residence at the time the department of children and families became involved with the family. The respondent also has three daughters from a previous relationship who reside with their mother.

[4] On June 15, 2007, Teresa Montelli of the sexual abuse clinic at Yale-New Haven Hospital conducted a forensic interview with each daughter making the allegations in the presence of Falk and representatives of local law enforcement. During this interview, the fifteen year old daughter alleged that the respondent sexually assaulted her for the first time when she was nine or ten years old. She alleged that he sexually assaulted her at least ten to fifteen times in the intervening years. She also alleged that the respondent raped her at the residence he shared with the child, at times forcing her to watch pornography at that residence as well.

The thirteen year old daughter alleged in the interview that the respondent had raped her when she was ten years old while her younger sister, another of the respondent's children, was at home watching television in another room.

telephoned the department hotline, making a referral in which she reported the allegations made by the respondent's daughters, the current living situation of the respondent and the necessity of immediate department involvement with the children at that residence.

Falk and another department investigator, Angelica Kadenas, later that day made an unannounced home visit at the respondent's residence to assess the safety of the children and to discuss the allegations the department had received. The respondent was not at home. Falk and Kadenas first met with the child's mother. After conducting a preliminary inquiry with the mother, Falk disclosed the allegations of sexual assault made by the respondent's daughters. Falk reported that the mother did not believe that the allegations were true and accused the respondent's daughters of lying. Falk informed the mother that she would be recommending to the department that the respondent have no contact with the mother's children until their investigation was completed. Falk further informed the mother that if she allowed the respondent to have contact with her children in light of the mother's knowledge of the allegations lodged against the respondent of repeated sexual assaults on his daughters, the department would seek legal action that could result in the removal of her children from her home.

The respondent soon after arrived at the residence. Falk informed him of the allegations of sexual assault made by his daughters. Falk reported that the respondent laughed and called the allegations "ridiculous," accusing his daughters' mother of concocting them. Falk informed the respondent of the department's recommendation that he leave the home and have no contact with the children living there. Falk reported that the respondent was reluctant to leave and that he stated that the mother and children should leave the home instead. Due to the respondent's reluctance to leave

the residence, local police were contacted, who, upon arrival, escorted the respondent out of the home. The mother and the respondent signed a service agreement that had as conditions, among others, that the respondent would not reside at the family residence or have contact with the children until they were notified by the department.

The department continued its investigation into the allegations of sexual assault[5] as well as the physical neglect of all the children residing with the respondent at the time the allegations were made. The petitioner, the commissioner of children and families, filed the neglect petition at issue on June 21, 2007. A trial was held on November 20, 2007. On the basis of the evidence presented, the court found that the petitioner had met her burden of proving by a preponderance of the evidence that the child was neglected on the date the petition was filed. The court found by a preponderance of the evidence that as a result of the nature of the allegations of repeated sexual assaults of his biological daughters, other children in the respondent's care and custody were similarly situated as the daughters. Therefore, the court found that the child was neglected on the date the petition was filed because he was denied proper care and attention, physically and emotionally, due to the potential for him to live under conditions, circumstances or associations injurious to his well-being.[6] See General Statutes § 46b-120 (9) (B) and (C).[7]

---

[5] See footnote 4. Also, local law enforcement started a criminal investigation of the allegations of sexual assault made against the respondent.

[6] The court ordered that there be no contact between the respondent and the child without department approval and supervision and placed the child under protective supervision. " 'Protective supervision' means a status created by court order following adjudication of neglect whereby a child's place of abode is not changed but assistance directed at correcting the neglect is provided at the request of the court through the Department of Children and Families or such other social agency as the court may specify . . . ." General Statutes § 17a-93 (i).

[7] General Statutes § 46b-120 (9) provides in relevant part: "[A] child or youth may be found 'neglected' who . . . (B) is being denied proper care

On appeal, the respondent claims that the court's finding of predictive neglect was clearly erroneous given the facts and evidence presented at trial.[8] Essentially, the respondent challenges the court's finding that the child was neglected at the time the petitioner filed the neglect petition. Specifically, he argues that the court's finding was clearly erroneous because there was no evidence presented that the child actually had been harmed, abused, neglected or uncared for prior to or after the filing of the petition, and, therefore, there was no evidence to support the court's finding of predictive neglect. We disagree.

"Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

and attention, physically, educationally, emotionally or morally, or (C) is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth . . . ."

[8] At oral argument, the respondent, for the first time, claimed that the trial court committed plain error. See Practice Book § 60-5. "Our practice requires an appellant to raise claims of error in his original brief, so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument." (Internal quotation marks omitted.) *Calcano* v. *Calcano*, 257 Conn. 230, 244, 777 A.2d 633 (2001). Furthermore, "[w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Citation omitted; internal quotation marks omitted.) *In re Matthew S.*, 60 Conn. App. 127, 133, 758 A.2d 459 (2000). Here, the respondent failed to brief his claim of plain error at all. We therefore decline to review the respondent's claim of plain error.

committed." (Internal quotation marks omitted.) *In re Jessica S.*, 51 Conn. App. 667, 674–75, 723 A.2d 356, cert. denied, 251 Conn. 901, 738 A.2d 1090 (1999).

"[A]n adjudication of neglect relates to the status of the child and is not necessarily premised on parental fault. A finding that the child is neglected is different from finding who is responsible for the child's condition of neglect. Although [General Statutes] § 46b-129 requires both parents to be named in the petition, the adjudication of neglect is not a judgment that runs against a person or persons so named in the petition; [*i*]*t is not directed against them as parents*, but rather is a finding that the children are neglected . . . ." (Emphasis in original; internal quotation marks omitted.) *In re T.K.*, 105 Conn. App. 502, 505–506, 939 A.2d 9, cert. denied, 286 Conn. 914, 945 A.2d 976 (2008). The central point of a neglect petition is not a denunciation of the parents but a determination of the status of the child. *In re Allison G.*, 276 Conn. 146, 164, 883 A.2d 1226 (2005).

Here, the respondent does not contest the court's underlying finding of facts with respect to the allegations of sexual assault lodged against him by his biological daughters that were pending on the date that the neglect petition was filed. Essentially, his argument is that the child was not denied proper care on or after the date of the filing. This is so, he contends, because he fully had complied with the agreed upon service plan by having no contact with the child and absenting himself from the child's residence. Therefore, the respondent concludes, on the date the neglect petition was filed or after, there was no basis for the finding of potential harm or risk of harm to occur in the future. "We review the application of a statute to a particular set of facts by the plenary standard of review." *In re Anthony A.*, 106 Conn. App. 389, 394, 942 A.2d 465 (2008).

In this case, the court found that on the date the petition was filed, the respondent had been accused of committing several sexual assaults of his biological daughters, at least one of which occurred in the child's home. There also was evidence that the mother of the child did not believe those accusations and was reluctant to agree to the department's service plan that excluded the respondent from the home. Furthermore, the mother, because of her status as an undocumented immigrant, had limited access to public assistance and financially was dependent on the respondent for maintaining the household and providing for the children. The mother, the record discloses, continued her relationship with the respondent despite her knowledge of the accusations lodged against him. The mother had provided bail money for him on June 13, 2007, one day after she learned of the allegations. Both the respondent and the mother had histories of domestic violence. Also, the court found that a criminal court had made a finding of probable cause to charge the respondent with multiple counts of sexual assault against his daughters stemming from the allegations made to the department. Last, there was nothing in place, such as a court order, to prevent the respondent from returning to the child's home.

"Our statutes clearly and explicitly recognize the state's authority to act before harm occurs to protect children whose health and welfare may be adversely affected and not just children whose welfare has been affected. . . . The public policy of this state is: To protect children whose health and welfare *may* be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary;

and for these purposes to require the reporting of *suspected* child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family." (Citation omitted; emphasis in original; internal quotation marks omitted.) *In re T.K.*, supra, 105 Conn. App. 511–12.

On the basis of our review of the record and the trial transcript, we conclude that the court's finding that the child was neglected on June 21, 2007, was not clearly erroneous. There was nothing to prevent the respondent from returning to the child's home at any time. See *In re Anthony A.*, supra, 106 Conn. App. 389 (finding of predictive neglect affirmed where child unharmed but nothing prevented respondent mother from returning to child's home). The fact that the respondent and the child's mother apparently were in compliance with the service plan that they had agreed upon with the department at that time does not change the analysis. "Just because services are accepted . . . does not mean that a child cannot be deemed neglected under our law. The doctrine of predictive neglect is grounded in the state's responsibility to avoid harm to the well-being of a child, not to repair it after a tragedy has occurred." *In re T.K.*, supra, 105 Conn. App. 513; see General Statutes § 17a-101.

The judgment is affirmed.

In this opinion the other judges concurred.