******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE HUNTER T.[*]
## (AC 49092)

Elgo, Wilson and Pellegrino, Js.

*Syllabus*

The respondent father appealed from the trial court's judgment adjudicating his minor child neglected and committing the child to the custody of the petitioner, the Commissioner of Children and Families. The father claimed, inter alia, that the court improperly determined that the commitment of the child to the petitioner was in the child's best interest. *Held*:

The trial court did not abuse its discretion in determining that committing the child to the custody of the petitioner, rather than the respondent father, was in the child's best interest, as the court could have reasonably relied on its factual findings, including the fact that the father previously had been convicted of risk of injury to a child in connection with a sexual offense and was reported to have a moderate risk of reoffending, and those findings were supported by the evidence in the record.

Argued February 9—officially released May 12, 2026[**]

*Procedural History*

Petition by the Commissioner of Children and Families to adjudicate the respondents' minor child neglected, brought to the Superior Court in the judicial district of Hartford, Juvenile Matters, and tried to the court, *Hon. Stephen F. Frazzini*, judge trial referee; judgment adjudicating the minor child neglected and committing him to the custody of the petitioner, from which the respondent father appealed to this court. *Affirmed*.

*David B. Rozwaski*, assigned counsel, for the appellant (respondent father).

*Timothy J. Holzman*, assistant attorney general, with whom were *Elizabeth Lewis*, assistant attorney general, and, on the brief, *William Tong*, attorney general, and

---

[*]In accordance with the spirit and intent of General Statutes §§ 46b-142 (b) and 54-86e and Practice Book § 79a-12, the full names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

[**]May 12, 2026, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Nisa Khan*, former assistant attorney general, for the appellee (petitioner).

*Josh Michtom*, assigned counsel, for the minor child.

*Opinion*

ELGO, J. The respondent father, Sean T., appeals from the judgment of the trial court adjudicating his minor child, Hunter T., neglected and committing Hunter to the custody of the petitioner, the Commissioner of Children and Families.[1] On appeal, the respondent claims that the court improperly determined that the commitment of Hunter to the petitioner was in Hunter's best interest.[2] We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of this appeal. In 2017, the respondent allegedly sexually assaulted his three year old niece. Per the affidavit filed in support of his arrest warrant application (arrest warrant affidavit),[3] the victim stated

---

[1] The propriety of the court's adjudication of neglect is not at issue on appeal.

The petition of neglect and order of temporary custody filed by the petitioner also named the respondent mother, Tinaza B. She has not appealed from the judgment of the trial court, and, accordingly, all references to the respondent in this opinion are to Sean T. only.

[2] Although the respondent in his appellate brief cites case law noting the fundamental constitutional rights of parents to maintain the integrity of the family and the constitutional limitations that exist whenever the state interferes with the family, he makes no specific claim of any violation of his due process rights. We therefore do not consider those general observations as distinct claims on appeal and decline to review them as such. See *In re Brianna C.*, 98 Conn. App. 797, 803–804 n.7, 912 A.2d 505 (2006) (declining to review general assertions of family integrity and liberty interests as protected by due process clause of constitution as distinct constitutional claim on appeal); see also *In re Dynastie D.*, 233 Conn. App. 662, 697 n.19, 341 A.3d 331 ("Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . ." (Internal quotation marks omitted.)), cert. granted, 353 Conn. 905, 342 A.3d 239 (2025).

[3] In his appellate reply brief, the respondent notes that the copy of the arrest warrant affidavit contained in the petitioner's appendix to her appellate brief was not part of the record before the trial court, as the

that the respondent had touched her breasts and genitals and that the inside of her genitals "'hurt,'" which suggested penetration. The victim further indicated that the sexual assault "occurred in a bedroom of her mother's residence," and the victim stated that the respondent had assaulted her while he "'played zombies with her . . . .'" At the time of the assault, the respondent was living with the victim and her family. The respondent subsequently was arrested and pleaded guilty to a reduced charge of risk of injury to a child in violation of General Statutes § 53-21 (a)(1).[4] He was sentenced to eight years of imprisonment, execution suspended, and three years of probation. The respondent is the subject of a lifetime protective order due to this incident.

Hunter was born in September 2018. In May 2025, he lived with his mother, Tinaza B., and two younger siblings, Riley B. and Noah F.[5] On May 29, 2025, Riley fell from a third-floor window in Tinaza's home. Emergency services responded and transported Riley to the Connecticut Children's Medical Center, where he was diagnosed with a fractured spine. The Department of Children and Families (department) received a critical incident report due to Riley's fall. Emergency services

record included only a redacted version of that affidavit. Our review of the record confirms this. We therefore disregard those portions of the petitioner's appellate brief and appendix that contain improper matter. See Practice Book § 60-2 (reviewing court may, "on its own motion . . . order improper matter stricken from a brief or appendix"); *Simms* v. *Zucco*, 214 Conn. App. 525, 527 n.2, 280 A.3d 1226 ("[b]ecause our review is confined to the record that was before the trial court, we shall disregard those portions of the plaintiff's appendix that do not conform to the guidelines set forth in the rules of practice" (internal quotation marks omitted)), cert. denied, 345 Conn. 919, 284 A.3d 982 (2022).

[4] General Statutes § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of (A) a class C felony for a violation of subdivision (1) . . . of this subsection . . . ."

[5] The matters relating to Riley and Noah are not at issue in this appeal.

described the unsafe and unsanitary living situation they observed in Tinaza's house to the department.

On June 2, 2025, the petitioner removed Hunter from Tinaza's custody on a ninety-six hour hold. On June 6, 2025, the petitioner obtained an ex parte order of temporary custody on behalf of Hunter and filed a neglect petition alleging that (1) Hunter was being denied proper care and attention, physically, educationally, emotionally or morally, and (2) he was permitted to live in conditions, circumstances or associations injurious to his well-being. At the department's request, the order of temporary custody for Hunter was vested in the respondent. Per the affidavit filed in support of the order of temporary custody (social worker affidavit), the department initially recommended that the order of temporary custody on behalf of Hunter be vested in the respondent because the department "assessed [the respondent] to be suitable and worthy of caring for [Hunter]. [The respondent] has appropriate housing," and the respondent expressed a willingness to ensure that Hunter's immediate and long-term needs are met. Significantly, although the social worker affidavit referenced the respondent being the subject of a lifetime protective order, it did *not* mention the respondent's conviction for risk of injury to a child.[6]

On June 20, 2025, counsel for Hunter filed an ex parte emergency motion to transfer the order of temporary custody from the respondent to the petitioner, based in part on the arrest warrant affidavit and the respondent's subsequent conviction for risk of injury to a child. That motion "contained information that [the respondent] had been convicted . . . for risk of injury for a sexual offense against a minor child; that he had been substantiated by [the department] for sexual abuse; but had then been successfully discharged after treatment by the Center for Treatment of Problem Sexual Behavior

---

[6] The social worker affidavit indicated that the respondent reported to the department that "he was set up by his cousins to be murdered and almost lost his life. He reported that he was arrested, and he beat the charges. [The respondent] reported the lifetime order was put in place because his cousins were concerned that he might retaliate."

and that his risk of reoffending was regard[ed] to be in the moderate range." The court granted the motion to transfer and vested the order of temporary custody with the petitioner, stating in relevant part that, "had that information been disclosed . . . the [court] probably would have [initially] vested the [order of temporary custody] for [Hunter] in the [petitioner]."

On July 1, 2025, the department prepared a social study in support of the neglect petition (social study). Per the social study, the respondent had been arrested on various charges relating to the sexual assault of a minor, which were reduced to a charge of risk of injury to a child.[7] The respondent completed a sex offender evaluation and treatment and successfully was discharged from care. The respondent's treatment provider reported that the respondent's reoffending risk was "in the moderate range but explained that . . . is quite low." The respondent has engaged in individual therapy through the Wheeler Clinic, where his therapist reported the respondent has been an active participant and compliant with attendance. The department, in the social study, recommended that Hunter be committed to the care and custody of the petitioner.

The joint hearing on the neglect petition and the order of temporary custody occurred on July 9, 15 and 23, 2025.[8] On the first day of the proceeding, the court

---

[7] In response to the social study questionnaire, the respondent declined to answer any questions regarding his criminal history because "the court already has that on file" and "repeating it on a social study is just a redundancy."

[8] At the preliminary hearing on the order of temporary custody, parentage of Hunter was confirmed. The respondent stated he did not intend to contest the order of temporary custody, as it was at that time vested in him, and he intended to stand silent on the adjudication of neglect. Tinaza both contested the order of temporary custody and denied the allegations of neglect. The court consolidated the hearing on the order of temporary custody and the adjudication of neglect.

The order of temporary custody for Hunter was initially vested in the respondent on June 6, 2025. Pursuant to an emergency motion filed by Hunter's counsel, the order of temporary custody for Hunter was vested in the petitioner on June 20, 2025. After the petitioner rested her case-in-chief in the neglect proceeding, the court ordered temporary

informed the parties that it would proceed to the disposition of Hunter if there was an adjudication of neglect. The court heard testimony from Doreen Parmentier, an investigator with the department; Joseph Mwangi, a social worker with the department; Chelsea James, a social worker with the department; Officer Francesco Barbagiovanni, the officer who prepared the arrest warrant affidavit; and Tinaza. In addition, a number of exhibits were admitted into evidence, including the redacted arrest warrant affidavit, the social worker affidavit, and the social study.

Relevant to this appeal, Tinaza testified, when questioned about the allegations contained in the arrest warrant affidavit, that Hunter currently plays the "zombie game." Tinaza's testimony was admitted into evidence without objection, and the respondent's counsel did not cross-examine Tinaza regarding her comment about Hunter playing the "zombie game."

The court noted that, according to Tinaza, Hunter has "behavioral issues, is diagnosed with [attention deficit hyperactivity disorder], and is in school based therapy . . . ." The court also found that Hunter had thirty-seven unexcused tardies and thirty-three unverified absences from school during the 2024–2025 school year. The court noted that three additional absences were not counted, as they were considered excused absences due to a family emergency.

The court first adjudicated Hunter neglected on the basis of educational neglect, that he was being denied proper care and attention, and he was being permitted to live in conditions injurious to his well-being.[9] The court then determined that it would be in Hunter's best

custody of Hunter to be vested in the respondent on July 9, 2025. After the close of the neglect proceeding, the petitioner's counsel and counsel for Hunter argued that it would be in Hunter's best interest to be committed to the care and custody of the petitioner. The respondent argued that it would be in Hunter's best interest to be placed with him under protective supervision.

[9] The propriety of the court's adjudication of neglect is not at issue on appeal. See footnote 1 of this opinion.

interest to be committed to the custody of the petitioner. This appeal followed.[10]

On appeal, the respondent claims that the court improperly determined that the commitment of Hunter to the custody of the petitioner was in his best interest. Specifically, the respondent argues that "there is no evidence nor credible testimony from the entire record to support the trial court's decision and judgment."[11] We disagree.

"Neglect proceedings, under . . . [General Statutes] § 46b-129, are comprised of two parts, adjudication and disposition . . . . The standard of proof applicable to nonpermanent custody proceedings, such as neglect proceedings, is a fair preponderance of the evidence." (Internal quotation marks omitted.) *In re Olivia W.*, 223 Conn. App. 173, 183, 308 A.3d 571 (2024). "After an adjudication of neglect, a court may (1) commit the child to the [petitioner], (2) vest guardianship in a third party or (3) permit the parent to retain custody with or without protective supervision. . . . In determining the disposition portion of the neglect proceeding, the court must decide which of the various custody alternatives are in the best interest of the child." (Citation omitted.) *In re Brianna C.*, 98 Conn. App. 797, 804, 912 A.2d 505 (2006); see also General Statutes § 46b-129 (j) (2).

"[W]hen making the determination of what is in the best interest of the child, [t]he authority to exercise the judicial discretion under the circumstances revealed by the finding is not conferred upon this court, but upon the trial court, and . . . we are not privileged to usurp that

[10] The attorney for Hunter has adopted the petitioner's appellate brief.

[11] Although the respondent claims that the court's decision was "clearly erroneous," the respondent substantively argues that there was "no evidence nor credible testimony from the entire record to support the trial court's decision and judgment." The respondent does not claim that any specific factual finding made by the court is clearly erroneous; rather, he attacks the dispositional determination as a whole. As such, we construe the respondent's claim as one that challenges the propriety of the court's discretionary determination as to which disposition was in Hunter's best interest based on its factual findings, not as one that challenges any of the court's individual findings.

authority or to substitute ourselves for the trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did. . . . To determine whether a custodial placement is in the best interest of the child, the court uses its broad discretion to choose a place that will foster the child's interest in sustained growth, development, well-being, and in the continuity and stability of [the child's] environment." (Citation omitted; internal quotation marks omitted.) *In re Olivia W.*, supra, 223 Conn. App. 188–89; see also *In re Anthony A.*, 112 Conn. App. 643, 654, 963 A.2d 1057 (2009) ("We have stated that when making the determination of what is in the best interest of the child, [t]he authority to exercise the judicial discretion under the circumstances revealed by the finding is not conferred upon this court, but upon the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . [G]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . [Appellate courts] are not in a position to second-guess the opinions of witnesses, professional or otherwise, nor the observations and conclusions of the [trial court] when they are based on reliable evidence." (Internal quotation marks omitted.)); *In re Haley B.*, 81 Conn. App. 62, 65, 838 A.2d 1006 (2004) ("Generally, questions of custodial placement are resolved by a determination of what is in the best interest of the child . . . as shown by a fair preponderance of the evidence. . . . The trial court is vested with broad discretion in determining what is in the child's best [interest]." (Citation omitted; internal quotation marks omitted.)).

During the dispositional phase, the court acknowledged that the department's witnesses "testified that [they] saw and found no imminent harm to [Hunter]

from being placed with [the respondent] on the [order of temporary custody]" and that the social study reported that "'Hunter and [the respondent] appear to have a good relationship, and there were never any concerns observed.'" The court nevertheless determined that it would not be in Hunter's best interest to be placed with the respondent in light of the arrest warrant affidavit, the respondent's prior conviction for risk of injury to a child, and Tinaza's testimony.

Specifically, the court found that the "arrest warrant affidavit . . . provides additional concerning information beyond the fact of a prior conviction for a heinous offense, as the arrest warrant affidavit mentions that the minor female victim mentioned [that the respondent] play[ed] zombies with her and touch[ed] her genitalia. From [that] evidence, it's not possible to ascertain whether the so-called zombies game is an aspect of child sexual abuse or an innocent game." The court noted the respondent's conviction and subsequent therapeutic interventions and opined that, although the evidence may suggest the respondent has rehabilitated, it had concerns. Specifically, the court found it to be "extremely concerning as [Tinaza] testified on the last day of trial, after [the] release of the [arrest warrant] affidavit disclosing the zombie game claim with the victim, that Hunter had told her that [the respondent] plays zombies with him." The court also found that, "[b]ut for [Tinaza's] testimony on that last day, the court could and would find that it was in Hunter's best interest for protective supervision to be vested in [the respondent] now. But the court cannot . . . make that finding now in view of [Tinaza's] testimony, which requires further assessment." The court noted credibility concerns with Tinaza's testimony as a whole and that no evidence existed that Hunter reported being sexually abused by the respondent. The court nevertheless concluded that, "if playing zombie games is incident to child sexual abuse, as suggested by the arrest warrant affidavit, such facts would negate [the respondent] as a safe and suitable placement for Hunter on an ongoing basis."

The court further found that Hunter "has behavioral problems, and he's been seeing a school based counselor. . . . It's clearly in Hunter's best interest to be enrolled in regular therapy both to help address his behavior problems and . . . to provide a safe place where concerns may be assessed regarding [Tinaza's] statement about Hunter disclosing playing zombie games with [the respondent]. The court does not have the professional expertise to determine whether such an assessment could [or] should occur in the context of ongoing therapy or in a clinical forensic interview, nor has evidence been offered on that question to allow the court to make a decision based on the evidence. But until such time as the question regarding [Tinaza's] allegation of Hunter disclosing playing zombie . . . games with [the respondent] can be assessed and refuted as an indicator of possible abuse, it cannot be found to be in Hunter's best interest being placed with [the respondent]. Based on this lack of information, the court cannot find at this time that it's in Hunter's best interest to be placed with [the respondent]." The court thereafter determined it to be in Hunter's best interest to be committed to the care and custody of the petitioner.

Upon our careful review of the record, we conclude that the court reasonably determined that it was in Hunter's best interest to commit him to the custody of the petitioner. In support of this determination, the court found that **(1)** Hunter suffers from behavioral problems that require counseling, **(2)** Hunter has been educationally neglected, and some of his recorded school absences occurred when in the respondent's care, **(3)** notwithstanding the evidence of the respondent's rehabilitation, the social study recorded him at a "'moderate risk'" of reoffending, which is considered a "low risk for reoffending," **(4)** there existed evidence in the record to suggest that the "zombies" game is a method for child sex abuse, **(5)** Hunter plays the "zombies" game with the respondent, and **(6)** the court noted that no party proffered evidence to allow it to fully evaluate whether the "zombies" game Hunter plays puts him at risk of sexual abuse. These findings were supported by evidence in the record, including, but not limited to, the arrest warrant

affidavit, the respondent's conviction, the social worker affidavit, the social study, school attendance records, Barbagiovanni's testimony, and Tinaza's testimony, and such evidence entered the record uncontroverted.[12] Moreover, the court could have reasonably relied on these findings to determine that committing Hunter to the petitioner's custody was in his best interest.[13] In sum, we conclude that the court did not abuse its discretion in committing Hunter to the custody of the petitioner.[14]

[12] Although the respondent proffered various emails, which included his responses to the social study questionnaire and a video of Hunter and the respondent together, the court specifically stated that it "does not necessarily credit or find helpful to its decision" that video. Moreover, the respondent's exhibits do not contravene any of the court's findings regarding his previous conviction for risk of injury, the statements in the arrest warrant affidavit, or Tinaza's testimony.

Although some of the evidence the court relied on in the dispositional phase entered the record over the respondent's objection, the respondent did not challenge the propriety of the court's evidentiary rulings on appeal. To the extent that the respondent challenges those rulings, he does so only in his reply brief to this court. Moreover, to the extent the respondent raises a challenge to the court's evidentiary rulings solely in his reply brief, it is inadequately briefed, and we decline to review it. See, e.g., *In re Christina M.*, 90 Conn. App. 565, 584, 877 A.2d 941 (2005) (claims not raised in principal brief may not be raised in reply brief), aff'd, 280 Conn. 474, 908 A.2d 1073 (2006).

[13] To the extent the respondent challenges the court's factual findings by citing evidence in the record that purportedly contradicts the court's findings, "[w]e iterate that [w]e give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . . As we conclude in this opinion, the court's factual findings in support of its dispositional determination were supported by evidence in the record, and, therefore, we decline to disturb them." (Citations omitted; internal quotation marks omitted.) *In re Olivia W.*, supra, 223 Conn. App. 194 n.14.

[14] We note that Hunter's commitment pursuant to § 46b-129 (j) "is not one of permanency, such as a judgment of termination of parental rights, but one that requires . . . the court to order specific steps which the parent must take to facilitate the return of the child or youth to the custody of such parent." (Internal quotation marks omitted.) *In re Brianna C.*, supra, 98 Conn. App. 805. In the present case, in addition to the court's conclusion that further assessment of the respondent and Hunter was warranted, there were several specific steps required of the respondent, including keeping appointments with the department, participating in individual counseling, and accepting any in-home services the department may offer. Furthermore, Hunter's commitment "may be revoked . . . at any time by the court"; General Statutes § 46b-129 (j) (2) (A); or upon

The judgment is affirmed.

In this opinion the other judges concurred.

---

motion by the respondent for the revocation of Hunter's commitment. General Statutes § 46b-129 (m); Practice Book § 35a-14A; see also *In re Patricia C.*, 93 Conn. App. 25, 30, 887 A.2d 929 (revoking commitment pursuant to § 46b-129 (m) constitutes two-pronged inquiry: (1) whether proof that no cause for commitment presently exists and (2) whether continued commitment nonetheless would be in best interest of child), cert. denied, 277 Conn. 931, 896 A.2d 101 (2006). Finally, we note that the department has an ongoing duty, unless and until there is a court finding that reunification efforts are no longer appropriate, to work toward the reunification of a child with his parent whose rights have not been terminated. See, e.g., General Statutes § 17a-111b (a) ("[t]he Commissioner of Children and Families shall make reasonable efforts to reunify a parent with a child"); *In re Amani O.*, 221 Conn. App. 59, 68, 301 A.3d 565 (2023) ("[t]he plain language of § 17a-111b requires the department to make reasonable efforts to reunify the parent with the child unless certain specific conditions are met").